Joanna Ardalan (Bar No. 285384)
jardalan@onellp.com
**ONE LLP**
23 Corporate Plaza, Suite 150-105
Newport Beach, CA 92660
Telephone:   (949) 502-2870
Facsimile:    (949) 258-5081

Jason Larey, Esq. *(pro hac vice application pending)*
FLORIDA BAR NO.:1019237
THE DOWNS LAW GROUP, P.A**.**
3250 Mary Street, Suite 307
Coconut Grove, Florida 33133
Telephone (305) 444-8226
Facsimile: (305)-444-6773
Email: jlarey@downslawgroup.com

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| BRITTA ALBERS;<br>TERRY BRIOT;<br>DIANE BOCZKOWSKI;<br>MARK CLARK;<br>TODD HANNAH;<br>DAWN HILL;<br>WANDA JARVIS-MASTIN;<br>BETH MAGIE;<br>SHELLEY McCORMACK;<br>LYNDA NARKEN;<br>KRISTINE REID;<br>MICHAEL SEVERSON;<br>MELVIN SHARP;<br>FRANK VERA III;<br>KANDI WIMBERLY; and,<br>EDWARD ZIGO<br><br>Plaintiffs, | CASE NUMBER:  5:24-cv-856<br><br>**COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u><br><br>**(1) STRICT PRODUCTS LIABILITY – DESIGN DEFECT;**<br>**(2) STRICT PRODUCTS LIABILITY – FAILURE TO WARN;**<br>**(3) STRICT PRODUCTS LIABILITY – ABNORMALLY DANGEROUS ACTIVITY;** |

v.

3M COMPANY;
AGC CHEMICALS AMERICAS, INC.;
AMEREX CORPORATION;
ARCHROMA U.S.,INC.,
ARKEMA, INC.;
BUCKEYE FIRE EQUIPMENT;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS, INC.;
CHEMGUARD, INC.;
CHEMOURS COMPANY LLC.;
CLARIANT, INC;
CORTEVA, INC.;
DEEPWATER CHEMICALS, INC.;
DUPONT DE NEMOURS, INC ;
DYNAX CORPORATION;
E. I. DU PONT DE NEMOURS & CO..;
JOHNSON CONTROLS, INC.;
HONEYWELL SAFETY PRODUCTS;
MSA SAFETY, INC.;
NATIONAL FOAM, INC.;
PBI PERFORMANCE PRODUCTS,
INC.;
PERIMETER SOLUTIONS, LP;
RAYTHEON TECHNOLOGIES
CORPORATION;
STEDFAST USA, INC.;
SOUTHERN MILLS INC. D/B/A
TENCATE PROTECTIVE FABRICS;
TYCO FIRE PRODUCTS, L.P.; and,
W.L. GORE & ASSOCIATES, INC.

Defendants

**(4) STRICT PRODUCTS
     LIABILITY – STATUTORY;**
**(5) NEGLIGENCE – FAILURE TO
     WARN;**
**(6) NEGLIGENCE PER SE;**
**(7) BATTERY;**
**(8) CONCEALMENT,
     MISREPRESENTATION, AND
     FRAUD**

**Complaint and Jury Demand**

COMES NOW, the Plaintiffs, by and through undersigned counsel, and allege upon information and belief as follows:

## INTRODUCTION

1.     The Plaintiffs' claims arise out of Defendants' decade-long calculated, fraudulent, and knowing concealment of their polluting activities that contaminated Plaintiffs' source of drinking water and caused the Plaintiffs serious health outcomes. Over the years, the Defendants knowingly and recklessly manufactured, designed, marketed, distributed, released, promoted, or sold bio-persistent, cancer-causing per- and polyfluoroalkyl ("PFAS") substances that were discharged into nearby streams/underground soil, including Plaintiff's source of drinking water while persistently and fraudulently denying the deleterious nature of their activities.

2.     Plaintiffs bring this action to recover monetary damages and appropriate equitable relief for harm sustained from exposure to, and consumption of, drinking water that Defendants knowingly contaminated with PFAS-containing Aqueous Film Forming Foam ("AFFF") products (PFAS) at various locations, such that the Defendants should have known that the said products would be delivered to George Air Force Base for training and firefighting activities. Other affected communities include the town of Adelanto and City of Victorville.[1]

3.     Plaintiffs are among other affected downstream residents who lived and/or worked at the George Air Force Base, and the surrounding areas within San Bernardino. Plaintiffs regularly consumed drinking water contaminated with the Defendants' PFAS chemicals.

4.     Defendants collectively designed, marketed, developed, produced, promoted, instructed on, distributed, and sold AFFF chemicals or products containing

---

[1]  U.S. Environmental Protection Agency, "Pre-Draft Record of Decision Operable Unit No. 2 George Air Force Base California" (Dec. 1992), (Apr. 2, 2024, 2:41 PM), https://semspub.epa.gov/work/09/100002261.pdf.

**Complaint and Jury Demand**

1  PFAS to the United States Air Force and military, including the George Air Force Base,

2  for fire training and firefighting activities.

3      5.    For purposes of this Complaint, the term *PFAS* will collectively include

4  perfluorooctane sulfonic acid ("PFOS"), perfluoroonoctanoic acid ("PFOA"),

5  perfluorononanoic acid ("PFNA"), perfluorobutanesulfonic acid ("PFBS"),

6  perfluorohexanesulfonic acid ("PFHxS"), and hexafluoropropylene oxide dimer acid

7  ("HPFO" or commonly referred to as "Gen-X Chemicals"), all of which fall within a

8  class of chemicals known as "PFAS" or "foam-forming chemicals." PFAS are found

9  within the fluorochemical products defined above as well as their precursors and

10 derivatives, all their salts and ionic states, as well as the acid forms of the molecules

11 and their chemical precursors.

12     6.    PFAS are persistent, toxic, and bio-accumulative compounds when

13 released into the environment. PFAS has impacted stormwater, surface water and

14 groundwater, and, effectively, contaminated the water relied on by Plaintiffs as their

15 primary source of drinking water throughout the time Plaintiffs were residents of

16 George Air Force Base.

17     7.    The International Agency for Research on Cancer ("IARC") announced

18 on December 1, 2023, that its Working Group re-assessed the carcinogenicity of PFOA

19 and found that PFOA is a Group 1 chemical that is carcinogenic to humans based on a

20 combination of evidence. IARC also performed its first assessment of PFOS and

21 classified it as a "Group 2" chemical based on strong evidence of possible

22 carcinogenicity.[2] IARC noted that since its previous evaluation of PFOA in 2014, the

23 number of animal bioassays has approximately doubled and there has been a vast

24 increase in the number of studies supporting its new classifications of these chemicals.[3]

25

26 _____

27 [2] International Agency of Research on Cancer, *IARC Monographs Evaluate the Carcinogenicity of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid* (accessed Apr. 2, 2024), available at https://www.iarc.who.int/wp-content/uploads/2023/11/QA_Mono135.pdf.

28 [3] *Id.*

- 4 -

**Complaint and Jury Demand**

8.    On March 14, 2023, the EPA put forth their proposal to establish legally enforceable levels for PFAS known to occur in drinking water.[4] The proposed regulation includes Maximum contaminant Levels (MCLs) which, if finalized, are legally enforceable regulatory drinking water standards. EPA establishes MCLs as close as feasible to the health based, non-enforceable, Maximum Contaminant Level Goal (MCLG), taking into consideration the ability to measure and treat to remove a contaminant, as well as the costs and benefits.[5] The EPA proposes to set the MCLG at **__zero__** for PFOS and PFOA.[6]

9.    In addition to announcing the proposed MCLs, the EPA enclosed an updated EPA FAQ Sheet, which makes clear that it is EPA's current position that there is no safe level for PFOA and/or PFOS in drinking water. The EPA ***determined PFOA and PFOS are likely carcinogens*** (i.e., cancer causing) and that ***there is no level of these contaminants that is without a risk of adverse health effects***.[7]

10.    Within the AFFF multi-district litigation, during the June 2019 Case Management Conference, the Court invited the parties to submit significant developments as they occur.[8]  Summarily, the Department of Justice submitted notice of the EPA rule proposals to the Court on March 14, 2023. [9]

---

[4] *See* Notice of Proposed Rulemaking, EPA-HQ-OW-2022-0114, https://www.regulations.gov/docket/EPA-HQ-OW-2022-0114/document

[5] *See* 42 U.S.C. § 300g–1(b)(4)(B).

[6] *Id.*

[7] Proposed PFAS National Primary Drinking Water Regulation FAQs for Drinking Water Primacy Agencies, U.S. Env't Prot. Agency, (Mar. 2023), https://www.epa.gov/system/files/documents/2023-03/FAQs_PFAS_States_NPDWR_Final_3.14.23_0.pdf.

[8] *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 129 (D.S.C. June 21, 2019)

[9] Letter from Christina M. Falk, Esq, U.S. Dep't of Justice, Asst. Dir., Civil Division, Environmental Torts, regarding EPA Issues Notice of Propose Rulemaking for maximum Contaminant Levels Under the Safe Drinking Water Act, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 2903 (March 14, 2023).

**Complaint and Jury Demand**

11.    To date, there is no safe, acceptable or "normal" level of PFAS in the human body.  Further, the fact that PFOA, PFOS, PFHxS, and PFNA are often found together presents a substantial risk to human health.  Defendants' assertions that their products are safe because they do not contain PFOA or PFOS, or because they contain short-chain PFAS is just another example of their efforts to deflect from the reality that there are thousands of PFAS – including precursor PFAS which degrade into PFOA and PFOS.[10]

12.    Defendants designed, advertised, manufactured, marketed, distributed, stored, sold, and/or used PFAS chemicals with the knowledge that these toxic compounds would be released into the environment during fire protection, fire training, and first response activities, even when used as directed and for the purposes intended by Defendants.

13.    Defendants knew or reasonably should have known that these compounds would reach groundwater, pollute drinking water supplies, render drinking water unusable and unsafe, and threaten public health and welfare, yet decided to cover it up, deny, and persistently avoided their obligations and responsibilities.

14.    At all times pertinent to this action, foam-forming chemicals provided by Defendants and discharged at George Air Force Base percolated into groundwater in and surrounding the base, contaminating the environment, including: lakes, rivers, ponds, creeks, and their banks; beaches; other land; ground and surface water; sewer systems; and drinking water supplies; including animals (further including fish and deer consumed by recreational hunters and fishermen) living in or on them, and exposing Plaintiffs to dangerously high levels of fluorochemicals, including PFAS, PFOS, and PFOA.

---

[10] Technical Fact Sheet - Perfluorooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA), U.S. Env't Prot. Agency, (Nov. 2017), https://19january2021snapshot.epa.gov/sites/static/files/2017-12/documents/ffrrofactsheet_contaminants_pfos_pfoa_11-20-17_508_0.pdf.

**Complaint and Jury Demand**

15.    At all times pertinent to this action, Plaintiffs did not know, nor should Plaintiffs have known, of the ongoing contamination of their drinking water through the use, release, storage, and/or disposal of Defendants' PFAS substances as Defendants failed to disclose the toxic nature and harmful effects of these PFAS chemicals. Plaintiffs' consumption, inhalation and/or dermal exposure to PFAS from Defendants' AFFF products caused Plaintiffs to develop the medical conditions alleged herein.

16.    Plaintiffs file this lawsuit to recover compensatory and punitive damages arising out of the permanent and significant damages sustained as a direct result of exposure to Defendants' PFAS chemicals at various locations during the course of Plaintiffs' careers as service members and/or firefighting training and firefighting activities. Plaintiffs further seek equitable relief and medical monitoring arising from the same.

## PARTIES TO THE ACTION

**A. Plaintiffs**

17.    Plaintiff, BRITTA ALBERS is a resident of Wrightwood, CA. Plaintiff is the child of a former service member. Plaintiff lived at the Air Force Academy Base, Wright-Patterson Air Force Base and at George Air Force Base. Plaintiff also attended George Air Force Base elementary school.

18.    Plaintiff, BRITTA ALBERS was resided at the Air Force Academy from 1968 to 1970. Following those years, Plaintiff moved to Wright-Patterson Air Force Base from 1970 to 1975 and then Plaintiff her family moved to George Air Force Base from 1975 to 1980.

19.    Plaintiff, BRITTA ALBERS regularly obtained and consumed her drinking water from the aforementioned Air Force Bases. As a result, she was exposed to PFAS chemicals through her water supply. Plaintiff was later diagnosed with papillary carcinoma of the thyroid and hypothyroidism.

**Complaint and Jury Demand**

20.     Plaintiff, TERRY BRIOT, is a resident and citizen of Wrightwood, CA. Plaintiff is the child of a former service member and was raised in Dayton, Ohio near Wright-Patterson Air Force Base and at George Air Force Base.

21.     Plaintiff, TERRY BRIOT, resided in Dayton, Ohio, near Wright-Patterson Air Force Base, in approximately 1970 through 1975. Plaintiff also resided at George Air Force Base for five years, from approximately 1975 through 1980.

22.     Plaintiff, TERRY BRIOT, regularly obtained and consumed her drinking water from the aforementioned Air Force Bases and neighboring area. As a result, she was exposed to PFAS chemicals through her water supply. Plaintiff was later diagnosed with multinodular thyroid disease and hypercholesterolemia as a result of her exposure.

23.     Plaintiff, DIANE BOCZKOWSKI, is a resident and citizen of Monticello, Indiana. Plaintiff was a former Child Day Care Services provider on George Air Force Base at the George Air Force Base Daycare Center.

24.     Plaintiff DIANE BOCZKOWSKI worked on George Air Force Base for eight (8) years, from 1977 to 1985 about. Plaintiff continued to live near George Air Force Base until approximately 1988.

25.     Plaintiff, DIANE BOCZKOWSKI, regularly obtained and consumed her drinking water from George Air Force Base. Plaintiff also would swim in the Mojave River, near the base. As a result, she was exposed to PFAS chemicals primarily through her water supply. Plaintiff was later diagnosed with thyroid disease and osteoporosis as a result of her exposure.

26.     Plaintiff, MARK CLARK, is a resident and citizen of Franklin, Kentucky. Plaintiff is a former Air Force Officer stationed on the Lackland Air Force Base, Lowery Air Force Base, George Air Force Base, and Elmendorf Air Force Base. During his military service, Plaintiff's primary duties were as an Aircraft Weapons Mechanic. Plaintiff recalls working in a shop that did overhaul repairs and inspections on the system and various weaponry i.e., missile launchers.

**Complaint and Jury Demand**

27.    Plaintiff, MARK CLARK, was stationed on Lackland Air Force Base from June 8, 1973, through July 8, 1973. Plaintiff was transferred to Lowery Air Force Base from July 8, 1973, through November 18, 1973. Plaintiff was then stationed at the George Air Force Base from November 25, 1973, through December 16, 1975. Plaintiff finished his service at the Elmendorf Air Force Base from January 2, 1976, to April 4, 1980

28.    Plaintiff, MARK CLARK, regularly obtained and consumed his drinking water from each of the aforementioned Air Force Bases. As a result, he was exposed to PFAS chemicals through his water supply. Plaintiff was later diagnosed with Hyperlipidemia and Prostate Cancer as a result of his exposure.

29.    Plaintiff, TODD HANNAH, is a resident and citizen of Felton, Delaware. Plaintiff is a former autopilot, repair, and flight control specialist, stationed at the Lackland Air Force Base, Chanute Air Force Base, George Air Force Base, and Joint Base McGuire-Dix-Lakehurst (f/k/a McGuire Air Force Base). During his military service, Plaintiff's primary duties included performing maintenance on different aircraft. Plaintiff also spent time in maintenance control. After he completed his military service, Plaintiff was a fire equipment salesman and is a volunteer civilian firefighter.

30.    Plaintiff, TODD HANNAH, was stationed on Lackland Air Force Base from approximately August 1982 through October 1982. Plaintiff was then stationed on Chanute Air Force Base from approximately October 1982 through March 1983. Plaintiff was next stationed on George Air Force Base from approximately March 1983 through October 1984. Plaintiff finished his military service on McGuire Air Force Base from approximately October 1984 through August 1986.

31.    Plaintiff, TODD HANNAH, regularly obtained and consumed his drinking water from the aforementioned Air Force Bases. As a result, he was exposed to PFAS chemicals through his water supply. Additionally, Plaintiff regularly used, and

**Complaint and Jury Demand**

1 was thereby directly exposed to, AFFF and/or turnout gear in training, to extinguish

2 fires, during response exercises, and during sales pitches and demonstrations as a

3 volunteer firefighter and during his working career as a fire equipment salesman,

4 respectively. Plaintiff was later diagnosed with acquired hypothyroidism, central

5 hypothyroidism, and hypothyroidism (chronic) as a result of his exposure.

6     32.    Plaintiff, DAWN HILL, is a resident and citizen of Rancho Santa

7 Margarita, California. Plaintiff is a former resident of both Wright-Patterson Air Force

8 Base, and George Air Force Base. Plaintiff generally stayed at home and took care of

9 children while residing on the Bases.

10     33.    Plaintiff, DAWN HILL, lived on Wright-Patterson Air Force Base for two

11 (2) years between 1973 and 1975. Thereafter, Plaintiff's former spouse was transferred

12 to George Air Force Base, where they lived for two (2) years, between 1975 and 1977.

13     34.    Plaintiff, DAWN HILL, regularly obtained and consumed her drinking

14 water from each of the aforementioned Air Force Bases. As a result, she was exposed

15 to PFAS chemicals through her water supply. Plaintiff was later diagnosed with

16 hypothyroidism and hyperlipidemia as a result of her exposure.

17     35.    Plaintiff, WANDA JARVIS-MASTIN, is a resident and citizen of Nuevo,

18 California. Plaintiff served in the United States Air Force and was stationed on Lowry

19 Air Force Base, Spangdahlem Air Base, and George Air Force Base. During her

20 military service, Plaintiff was a weapons control systems mechanic.

21     36.    Plaintiff, WANDA JARVIS-MASTIN, was stationed on Lowry Air Force

22 Base from approximately 1981 through 1982, Spangdahlem Air Base from

23 approximately 1982 through 1985, and George Air Force Base George Air Force Base

24 from approximately 1985 through 1986.

25     37.    Plaintiff, WANDA JARVIS-MASTIN, regularly obtained and consumed

26 her drinking water from each of the aforementioned Air Force Bases. As a result, she

27 was exposed to PFAS chemicals through her water supply. Plaintiff was later diagnosed

28

**Complaint and Jury Demand**

with pregnancy-inducted hypertension, osteoporosis, and hyperlipidemia as a result of her exposure.

38.   Plaintiff, BETH MAGIE, is a resident and citizen of Smithfield, Pennsylvania. Plaintiff is a retired Airwoman, honorably discharged after four (4) years of military service. Prior to Plaintiff's rotation to George Air Force Base, she completed six (6) weeks of basic training at San Antonio Air Force Base in 1980. After basic training, Plaintiff continued her military training at Lowry Air Force Base (Denver, Colorado) for approximately twenty-one (21) months.

39.   Plaintiff, BETH MAGIE, was stationed at George Air Force Base for about thirty-four (34) months, from October 1981 to December 1984 for her military service.

40.   Plaintiff, BETH MAGIE, regularly obtained and consumed her drinking water from each of the aforementioned Air Force Bases. As a result, she was exposed to PFAS chemicals through her water supply. Plaintiff was later diagnosed with hypothyroidism and hyperlipidemia as a result of her exposure.

41.   Plaintiff, SHELLEY McCORMACK, is a resident and citizen of Hesperia, California. Plaintiff is a former resident of the George Air Force Base. Plaintiff was a resident of the Base as she was the child of a military member.

42.   Plaintiff, SHELLEY McCORMACK, resided at George Air Force Base from approximately 1974 through 1978.

43.   Plaintiff, SHELLEY McCORMACK, regularly obtained and consumed her drinking water from George Air Force Base. As a result, she was exposed to PFAS chemicals through her water supply. Plaintiff was later diagnosed with chronic kidney disease and endometriosis as a result of her exposure.

44.   Plaintiff, LYNDA NARKEN, is a resident and citizen of Wrightwood, CA. Plaintiff resided on the George Air Force Base and Wright-Patterson Air Force Base.

**Complaint and Jury Demand**

Plaintiff generally stayed at home and took care of her children while residing on the Bases.

45.    Plaintiff, LYNDA NARKEN resided on Wright-Patterson Air Force Base from 1969 to 1975 and later at George Air Force Base from 1975 to 1978.

46.    Plaintiff, LYNDA NARKEN, regularly obtained and consumed her drinking water from each of the aforementioned Air Force Bases. As a result, she was exposed to PFAS chemicals through her water supply. Plaintiff was later diagnosed with hyperparathyroidism, osteoporosis and hyperlipidemia as a result of her exposure.

47.    Plaintiff, KRISTINE REID, is a resident and citizen of Everly, Iowa. Plaintiff is a former resident of George Air Force Base. Plaintiff resided and attended day care on Base, as she was the child of military parents stationed on George Air Force Base.

48.    Plaintiff, KRISTINE REID, was born and resided on George Air Force Base from approximately December 1980 to December 1982. Plaintiff regularly attended daycare from the age of approximately six weeks old until two years old.

49.    Plaintiff, KRISTINE REID, regularly obtained and consumed her drinking water from George Air Force Base. As a result, she was exposed to PFAS chemicals through her water supply. Plaintiff was later diagnosed with polycystic ovary syndrome ("PCOS") and hyperlipidemia, as a result of her exposure.

50.    Plaintiff, MICHAEL SEVERSON, is a resident and citizen of Hamilton, Alabama. Plaintiff is a former resident of the Lackland Air Force Base, Keesler Air Force Base, and George Air Force Bases. Plaintiff's primary role was a command-and-control specialist for air operations management. His primary duties included, communications, operational management of forces, and effective communications between units.

51.    Plaintiff, MICHAEL SEVERSON, resided on Lackland Air Force Base from October of 1978 through November of 1978. Thereafter, Plaintiff was transferred

**Complaint and Jury Demand**

to Keesler Air Force Base from November of 1978 through February of 1979. Plaintiff finished his service at George Air Force Base from February of 1979 through February of 1980.

52.    Plaintiff, MICHAEL SEVERSON, regularly obtained and consumed his drinking water from each of the aforementioned Air Force Bases. As a result, he was exposed to PFAS chemicals through his water supply. Plaintiff was later diagnosed with hypothyroidism, hypogonadism, and hyperlipidemia as a result of his exposure.

53.    Plaintiff, MELVIN SHARP, is a resident and citizen of Pocola, Oklahoma. Plaintiff is a former Weapons Mechanic on George Air Force Base and McClellan Air Force Base. During his military service, his primary duties included loading and unloading of weapons on aircrafts, checking the fuses of the weapons, and making sure the systems were all up and running.

54.    Plaintiff, MELVIN SHARP, was stationed on Lowry Air Force Base for approximately 3 months while he underwent technical school in 1972. Thereafter, Plaintiff was stationed on McClellan Air Force Base in 1973. Plaintiff finished his service at George Air Force Base from the year 1973 to 1974.

55.    Plaintiff, MELVIN SHARP, regularly obtained and consumed his drinking water from each of the aforementioned Air Force Bases. As a result, he was exposed to PFAS chemicals through his water supply. Plaintiff was later diagnosed with chronic kidney disease as a result of his exposure.

56.    Plaintiff, FRANK VERA III, is a resident and citizen of Jamestown, California. Plaintiff was a former Air Force Officer on the George Air Force Base, Lackland Air Force Base and Lowery Air Force Base.

57.    Plaintiff, FRANK VERA III, was stationed on Lackland Air Force Base for two (2) months from August 1972 to October 1972, while he underwent basic training. Thereafter, Plaintiff was stationed on Lowery Air Force Base in Denver from

**Complaint and Jury Demand**

October 1972 to February 1973. Finally, he was transferred to George Air Force Base for approximately fifteen (15) months from February 1973 to May 1974.

58.    Plaintiff, FRANK VERA III, regularly obtained and consumed his drinking water from each of the aforementioned Air Force Bases. As a result, he was exposed to PFAS chemicals through his water supply. Plaintiff was later diagnosed with hypogonadism, hypothyroidism, osteoporosis and hyperuricemia as a result of his exposure.

59.    Plaintiff, KANDI WIMBERLY, is a resident and citizen of Ontario, Oregon. Plaintiff lived on and near George Air Force Base as a civilian with her military spouse.

60.    Plaintiff, KANDI WIMBERLY, lived on and around George Air Force base from approximately 1987 through 1991. Between 1987 and 1989, Plaintiff lived in the city of Adelanto for approximately two (2) years at a distance of approximately one (1) mile from George Air Force Base. Plaintiff moved to the city of Victorville, which is also next to George Air Force Base, where she and her husband lived in a house approximately five (5) to ten (10) miles off base for approximately one (1) year, until early 1990. Plaintiff lived on George Air Force Base with her husband from April 1990 through July 1991.

61.    Plaintiff, KANDI WIMBERLY, regularly obtained and consumed her drinking water from the aforementioned Air Force Base. As a result, she was exposed to PFAS chemicals through her water supply. Plaintiff was later diagnosed with hyperlipidemia as a result of her exposure.

62.    Plaintiff, EDWARD ZIGO, is a resident and citizen of Madison, North Carolina. Plaintiff is a former dental specialist and medic stationed on the Lackland Air Force Base, Sheppard Air Force Base, and George Air Force Base. During his military service, Plaintiff's primary duties included his work in the dental laboratory performing fillings.

**Complaint and Jury Demand**

63.     Plaintiff, EDWARD ZIGO, was stationed on Lackland Air Force Base for basic training from approximately November 17, 1972 through February 1973. Plaintiff was then transferred to Sheppard Air Force Base, where he went to dental school training for approximately four (4) to six (6) months. Plaintiff then finished his service at the George Air Force Base in 1974, where he was honorably discharged.

64.     Plaintiff, EDWARD ZIGO, regularly obtained and consumed his drinking water from each of the aforementioned Air Force Bases. As a result, he was exposed to PFAS chemicals through his water supply. Plaintiff was later diagnosed with hyperlipidemia and thyroid disorder as a result of his exposure.

**B. <u>Defendants</u>**

65.     Upon information and belief, Defendants' Fluorochemical Products including, but not limited to, PFOA and PFOS containing fluorochemicals/intermediates and AFFF, were used at the military installation(s) at which Plaintiffs resided and worked, fire training facilities, and/or fire departments such that those compounds traveled by stormwater, surface water, groundwater, and contaminated Plaintiffs' drinking water supply and/or chemical exposure through dermal and inhalation exposure pathways. Defendants' Fluorochemical Products have also been used and disposed of into wastewater systems and the environment in general, causing contamination to stormwater, surface water, and groundwater that traveled to Plaintiff's drinking water supply.

66.     Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company), ("3M"), is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133, and is registered to do business in California. Beginning before 1970 and until at least 2002, 3M manufactured, distributed, and sold Fluorochemical Products. 3M manufactured, distributed, and sold AFFF containing PFAS throughout the United States, including in California. 3M researched, developed, manufactured, designed,

**Complaint and Jury Demand**

marketed, distributed, released, promoted, and/or otherwise sold products and raw materials containing PFAS in markets around the country, including within California, since at least the 1970s. The sale of these chemicals was volitional and intentionally directed at the California market, and defendants thereby availed themselves of California laws.

67.     Defendant AGC Chemicals Americas Inc. ("AGC") is a corporation organized and existing under the laws of Delaware, having a principal place of business in 5 East Uwchlan Avenue, Suite 201, Exton, PA 19341. AGC and/or its affiliates manufactured fluorochemicals used in AFFF. AGC does and/or has done business throughout the United States, including in California, and is registered to do business in California. On information and belief, AGC is the North American subsidiary of AGC Inc. (f/k/a Asahi Glass, Co., Ltd.) and does business throughout the United States, including in California.

68.     Defendant Amerex Corporation ("Amerex") is an Alabama corporation and does business throughout the United States. Amerex has its principal place of business at 7595 Gadsden Highway, Trussville, Alabama 35173. Amerex made, manufactured, distributed, marketed, and/or sold fluorochemical products throughout the United States, including conducting business in California.

69.     Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorochemical Products for use in AFFF sold throughout the United States, including in California. On information and belief, Archroma is a successor to Clariant.

70.     Defendant Arkema, Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406. Arkema and/or its predecessors manufactured

**Complaint and Jury Demand**

fluorosurfactants used in AFFF. Arkema is a successor in interest to Atochem North American, Inc., Elf Atochem North America, Inc., and Atofina Chemicals, Inc. and does and/or has done business throughout the United States, including in California.

71.    Defendant Buckeye Fire Equipment ("Buckeye") is a North Carolina corporation that does business throughout the United States, including conducting business in California. Buckeye has its principal place of business in Kings Mountain, North Carolina. Buckeye developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California.

72.    Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, UTC is now a division of Carrier and manufactured and sold fluorochemical products. Upon information and belief, Carrier does and/or has done business throughout the United States, including California. Carrier inherited UTC's Fire & Security businesses, including the Chubb Fire and Kidde-Fenwal brands, when it was formed in March 2020. Carrier is now the parent corporation of Kidde-Fenwal Inc., a manufacturer of fluorochemical products.

73.    Defendant ChemDesign Corporation ("ChemDesign") is a Massachusetts corporation with its principal place of business in Fitchburg, Massachusetts. ChemDesign is a wholly-owned subsidiary of Chestnut Acquisition Corporation ("Chestnut"), a Delaware corporation with its principal place of business in New Jersey. ChemDesign Products, Inc. manufactured fluorochemical products for Tyco/Chemguard AFFF products.

74.    Defendant Chemguard, Inc. is a Texas corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143. Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA. Upon information

**Complaint and Jury Demand**

1    and belief, Chemguard manufactured, distributed, and/or sold AFFF foam containing

2    PFOA throughout the United States including in California. Upon information and

3    belief, Chemguard manufactured, distributed, and/or sold AFFF foam containing

4    PFOA in California and which has contaminated Plaintiffs' drinking water supply.

5    75.    Defendant Chemours Company ("Chemours") is a corporation duly

6    organized under the laws of the State of Delaware, with its principal place of business

7    located at 1007 Market Street, Wilmington, Delaware 19899. Chemours does business

8    throughout the United States, including conducting business in California. Chemours

9    was a wholly owned subsidiary of Old DuPont. In July 2015, Old DuPont completed

10    its spin-off of Chemours as a separate, publicly traded, entity. Chemours has since then

11    received and begun manufacturing certain product lines from Old DuPont, including

12    some product lines involving manufacture, sale, and distribution of PFAS-containing

13    intermediates and Fluorochemical Products. In connection with the spin-off, Chemours

14    assumed direct liability for Old DuPont's decades-long history of causing widespread

15    PFAS contamination in California, around the country, and indeed the world.

16    76.    Defendant Clariant Corporation ("Clariant") is a New York corporation

17    with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina.

18    Clariant research, developed, manufactured, designed, marketed, distributed, released,

19    promoted, and otherwise sold PFAS and fluorochemical products, including AFFF, in

20    markets around the United States, including within California.

21    77.    Defendant Corteva, Inc. ("Corteva") is a Delaware incorporated company

22    with its principal place of business at 974 Centre Road, Building 730, Wilmington,

23    Delaware 19805. Corteva is one of the spin-off companies from DowDuPont, Inc., and

24    is believed to have assumed some of the PFAS liabilities of Old Dupont.

25    78.    Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation

26    organized under the laws of Delaware, with its principal place of business located at

27    196122 E County Road 40, Woodward, OK, 73801. On information and belief,

28

**Complaint and Jury Demand**

Deepwater Chemicals designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products throughout the United States.

79.    Defendant Dynax Corporation ("Dynax") is a corporation organized and existing under the laws of Delaware and having a principal place of business at 79 Westchester Avenue, Pound Ridge, New York 10576 and an address for service of process at 103 Fairview Park Drive Elmsford, New York 10523-1544. On information and belief, Dynax researched, developed, manufactured, designed, marketed, distributed, released, promoted, and otherwise sold PFAS and fluorochemical products, including compounds used in AFFF, throughout the Unified States, including California.

80.    Defendant E. I. du Pont de Nemours and Company ("Old DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. Old DuPont has done business throughout the United States, including conducting business in California, and is registered to do business in California. Old DuPont has been involved in the production and sale of fluorochemical intermediaries for use in AFFF manufacturing since the 1950s. When 3M left the market, Old DuPont took on a larger role in the AFFF market. Old DuPont has also manufactured, distributed, and sold Fluorochemical Products and raw PFAS around the country pursuant to a nationwide marketing campaign, including in California. Also, on information and belief, Old DuPont was engaged in joint ventures and other business arrangements with California entities for the development of Fluorochemical Products.

81.    Defendant DuPont de Nemours, Inc., formerly known as DowDuPont Inc. ("New DuPont") is a corporation duly organized under the laws of the State of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. New DuPont does business throughout the United States, including

**Complaint and Jury Demand**

in California. New DuPont assumed direct liability for Old DuPont's decades-long history of causing widespread PFAS contamination in California, around the country, and indeed the world.

82.    Defendant Honeywell Safety Products USA, Inc. is a corporation duly organized under the laws of the State of Delaware with its registered place of business in the U.S. at 9680 Old Bailes Road, Fort Mill, SC. Honeywell does business throughout the United States, including in California. Upon information and belief, Honeywell developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California.

83.    Defendant PBI Performance Products, Inc.("PBI") is a South Carolina corporation that does business throughout the United States, including conducting business in California. PBI has its principal place of business in Northern Charleston, South Carolina. PBI developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California.

84.    Defendant MSA Safety, Inc., is a corporation duly organized under the laws of the State of Pennsylvania. MSA has its principal place of business in Cranberry Township, Pennsylvania. In 2017, MSA acquired Globe Holding Company, LLC and its subsidiaries (collectively, "MSA/Globe") and continues to do business under the Globe name. MSA developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in Class B foams, including in California.

85.    Defendant National Foam, Inc. ("National Foam," a/k/a Chubb National Foam) is a corporation organized and existing under the laws of Delaware, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501. National Foam manufactures AFFF agents, including Universal Gold and the Angus brand of

**Complaint and Jury Demand**

products and is the successor-in-interest to Angus Fire Armour Corporation (collectively, "National Foam/Angus Fire"). At all relevant times, National Foam manufactured and sold fluorochemical products.

86.    Defendant Perimeter Solutions, LP, ("Perimeter Solutions") is a Delaware corporation that does business throughout the United States, including conducting business in California. Perimeter Solutions has a principal place of business at 8000 Maryland Avenue, Suite 350, Clayton, Missouri 653105. In 2019, Perimeter Solutions purchased a products division of Amerex. Perimeter developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams and AFFF, including in California.

87.    Defendant Raytheon Technologies is the parent company of United Technologies Corporation ("UTC") Fire and Security. Upon information and belief, Raytheon Company and Collins Aerospace are subsidiaries of Raytheon Technologies. Raytheon is a corporation organized under the laws of Delaware with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032. On information and belief, Kidde-Fenwal, Inc., a manufacturer of PFAS products, was acquired by UTC in or around 2005. Raytheon does and/or has done business throughout the United States, including California, and manufactured and sold PFAS and/or AFFF containing PFAS.

88.    Defendant StedFast USA, Inc. ("StedFast") is a Delaware corporation that does business throughout the United States, including conducting business in California. StedFast has its principal place of business in Piney Flats, Tennessee. StedFast developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnouts and/or Class B foams, including in California.

89.    Defendant Southern Mills Inc. d/b/a TenCate Protective Fabrics ("Tencate") is a Georgia corporation that does business throughout the United States,

**Complaint and Jury Demand**

1  including conducting business in California. Tencate's principal place of business is in
2  Union City, Georgia. Defendant Tencate developed, manufactured, marketed,
3  distributed, released, sold, and/or used PFAS and PFAS products, in turnouts and Class
4  B foams, including in the state of California.

5       90.    Defendants Tyco Fire Products LP and Johnson Controls: Defendant Tyco
6  Fire Products LP ("Tyco") is a limited partnership formed in the State of Delaware with
7  its principal place of business at 1400 Pennbrook Parkway, Landsdale, Pennsylvania.
8  Tyco is an indirect subsidiary and ultimately wholly owned by Defendant Johnson
9  Controls International PLC, an Irish public limited company listed on the New York
10 Stock Exchange [NYSE: JCI]. Defendant Johnson Controls has its principal place of
11 business at 5757 North Green Bay Avenue, Milwaukee, Wisconsin 53209. Upon
12 information and belief, Tyco and Johnson Controls have had a services agreement in
13 place since 2016 pursuant to which Johnson Controls provides services to Tyco. Tyco
14 is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in
15 1990. (Ansul and Tyco, as the successor in interest to Ansul, will hereinafter be
16 collectively referred to as "Tyco/Ansul.") Beginning in or around 1975, Ansul
17 manufactured and/or distributed and sold AFFF that contained fluorochemical
18 surfactants containing PFOA throughout the United States, including in California.
19 After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute,
20 and sell AFFF that contained fluorocarbon surfactants containing PFOA throughout the
21 United States, including in California. Tyco/Ansul does business throughout the United
22 States including in California. Upon information and belief, Tyco/Ansul manufactured,
23 distributed, and/or sold AFFF foam containing PFOA in California which has
24 contaminated Plaintiffs' water supply.

25      91.    Defendant W. L. Gore & Associates, Inc., ("Gore") is a Delaware
26 corporation that does business throughout the United States, including conducting
27 business in California. Gore has its principal place of business in Newark, Delaware.
28

**Complaint and Jury Demand**

Gore developed, manufactured, marketed, distributed, released, sold, and/or used PFAS, PFAS materials, and products containing PFAS in turnout gears and/or Class B foams, including in California.

92.    Any references to a defendant or defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named defendants.

93.    This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331. The claims herein arise from exposure to PFAS contaminated water sources on bases operated by the United States Air Force. Many Plaintiffs were exposed as a result of their service duties with the United States Air Force. Where tort claims arise out of toxic exposure to chemicals on federally owned and operated land, federal enclave jurisdiction exists. Therefore, Plaintiffs claims present a question arising under federal law and are properly brought in this Court.

## JURISDICTION AND VENUE

94.    Venue is proper in this District Court pursuant to 28 U.S.C. §1391 because it is the judicial district in which Plaintiffs were residents and/or citizens, a substantial part of the events or omissions giving rise to the claims occurred, and/or Defendants conduct business within the district.

95.    The United States District Court for the Central District of California further has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants purposefully manufactured, designed, marketed, advertised, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing fluorochemical products, including AFFF, to various locations in the United States and California, such that each Defendant knew or should have known that said products would be delivered to areas in California, such that each Defendant knew or should have known that said products would be delivered to areas in California

**Complaint and Jury Demand**

for active use including, but not limited to, during the course of training and firefighting activities, including areas within Plaintiffs' drinking water supply.

96.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the Defendants engaged in business in the State of California.

97.     Plaintiffs are informed and believe, and based thereon allege that, at all relevant times, the Defendants have engaged in substantial, continuous economic activity in California, including the business of researching, designing, formulating, handling, disposing, manufacturing, labeling, using, testing, distributing, promoting, marketing, selling, advertising and/or otherwise being responsible for PFAS chemicals, and that said activity by the Defendants is substantially connected to the Plaintiffs' claims as alleged herein.

98.     Based on information and belief, the Defendants purposefully affiliated themselves with the forum of the State of California giving rise to the underlying controversy.

99.     At all times pertinent to this action, the Defendants had actual knowledge that each of the other Defendants was going to intentionally and negligently engage in the tortious misconduct and acts alleged in the causes of action set forth in this complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of duties of care owed by each of the Defendants to Plaintiffs.[11]

100.     Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Central District of California does not offend traditional notions of fair play and substantial justice.

101.     Joinder of all parties is proper pursuant to Rule 20(a) of the Federal Rules of Civil Procedure. Defendants are permissively joined in this action because the

---

[11] EWG, For 50 Years, Polluters Knew PFAS Chemicals Were Dangerous But Hid Risks From Public, https://static.ewg.org/reports/2019/pfa-timeline/3M-DuPont-Timeline_sm.pdf?_ga=2.39807139.1262723487.1643418367-1574750726.1643418367.

**Complaint and Jury Demand**

exposure, injuries, and relief requested all arise out of similar transactions or occurrences and questions of law and fact are common to all parties.

## **TOLLING OF THE STATUTE OF LIMITATIONS**
### **Discovery Rule Tolling**

102.   Plaintiffs did not know, nor could have reasonably discovered by the exercise of reasonable diligence, that exposure to fluorochemical products, including AFFF, was harmful to human health. The risks of said chemicals and AFFF were not obvious to the users of AFFF, nor were they obvious to individuals such as Plaintiff in the vicinity of AFFF use. Since Plaintiffs could not have reasonably discovered the defects and risks associated with the use of fluorochemical products, the Plaintiffs could not protect themselves from exposure to Defendants' fluorochemical products. For this reason, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to each Plaintiff's claims.

103.   Plaintiffs had no way of knowing about the risk of serious injury associated with the use of, and exposure to, AFFF and fluorochemical products until very recently. Further, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to AFFF is harmful to human health within the time period allowed by any applicable statute of limitations.

104.   During the relevant times, Plaintiffs did not possess specialized scientific or medical knowledge. Plaintiffs did not, and could not, have discovered or known facts that could cause a reasonable person to suspect the risk associated with the use of Defendants' fluorochemical products. Further, a reasonable and diligent investigation by Plaintiffs earlier would not have disclosed that AFFF could cause personal injury.

### **Fraudulent Concealment**

105.   Wherefore, all applicable statutes of limitations pertaining to each Plaintiff's claims have been tolled by operation of the discovery rule.

**Complaint and Jury Demand**

106.   Rather than disclose critical safety and health information regarding its AFFF and fluorochemical products, Defendants have consistently and falsely represented the safety of AFFF products.

107.   This fraudulent concealment continues to the present day.

108.   Wherefore, due to Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein through the relevant time for this action, all applicable statutes of limitations have also been tolled.

**Estoppel**

109.   Defendants were under a continuous duty to consumers, end users, and other persons, such as the Plaintiffs, coming into contact with their fluorochemical products, to provide truthful and reliable safety information concerning their products and the risks associated with their use, as well as exposure to AFFF.

110.   Rather than fulfill this duty, Defendants knowingly, affirmatively, and actively concealed important safety information and warnings concerning AFFF and the health risks associated with the same.

111.   Wherefore, Defendants are estopped from relying on any statute of limitations in defense of this action.

**BACKGROUND AND FACTUAL ALLEGATIONS REGARDING THE PFAS COMPOUNDS**

112.   PFAS chemicals are a family of chemical compounds containing fluorine and carbon atoms.

113.   Aqueous film-forming foam ("AFFF" or "foam-forming chemical), a form of Long Chain PFAS, is a fire suppressant used to extinguish fires consisting of flammable liquid such as fuels. This PFAS family of chemicals is entirely anthropogenic and do not exist in nature.

**Complaint and Jury Demand**

114.   As a family of PFAS, AFFF products are persistent, toxic, and bio-accumulative, as well as highly mobile in soil and groundwater.[12]

115.   Exposure to PFAS has been associated with several negative health outcomes in both humans and animals, including, but not limited to, chronic medical conditions and cancers.[13]

116.   The U.S. Environmental Protection Agency (EPA) has noted that "drinking water can be an additional source [of PFOA/PFOS in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example ... an airfield at which [PFOA/PFOS] were used for firefighting."[14]

117.   Defendants are designers, marketers, manufacturers, developers, distributors, promotors, instructors, and sellers of PFAS-containing AFFF products and/or underlying chemicals containing PFAS used in AFFF that were used and disposed of on George Air Force Base in Victorville, California.

118.   George Air Force Base is a decommissioned military base located in Victorville, California that was classified as a "Superfund site" by the Environmental Protection Agency ("EPA) and officially closed in 1992.[15]

---

[12]   U.S. Department of Health and Human Services, 2021 Toxicological Profile for Perfluoroalkyls Released, (last visited Sep. 23, 2023) at: https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf

[13]   ATSDR, *What are the Health Effects of PFAS?,* Agency for Toxic Substances and Disease Registry, Toxicological Profile for Perfluoroalkyls ch. 1, at 3. (2021), https://www.atsdr.cdc.gov/pfas/health-effects/index.html [https://perma.cc/PEY3-98XL]. *See also* Jodi Green, *A Roadmap to Insurance Coverage for the Mother of Toxic Torts: PFAS*, JD SUPRA (Sept. 9, 2022), https://www.jdsupra.com/legalnews/a-roadmap-to-insurance-coverage-for-the-9877551/ [https://perma.cc/959L-CX49]

[14]   *See* "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sites/default/files/2016-06/documents/drinkingwaterhealthadvisories_pfoa_pfos_updated_5.31.16.pdf

[15]   Air Force Civil Engineer Center, Cleanup Effort Continues at Former George Air Force Base, https://www.afcec.af.mil/Home/BRAC/George/Cleanup.aspx (last visited April 10, 2024).

**Complaint and Jury Demand**

1

2                    **THE PLAINTIFFS' WATER SUPPLY**

3        119.   On information and belief, various formulations of fire-extinguishing

4    materials, which include AFFF,[16] were used as part of fire trainings and other

5    activities conducted at George Air Force Base from the 1940s until 1992, when the

6    base was decommissioned.[17]  Due to the use of AFFF, PFCs entered and are now

7    detected in the groundwater directly under and around George Air Force Base.[18]

8        120.   George Air Force base historically had two (2) long-term, independent

9    Fire Training Areas ("FTA"); one location operated between 1969 to early 1992

10   and the second location operated between 1940 through 1970.[19] In the 1970's, the

11   Air Force began using two PFAS chemicals (PFOA and PFOS) in its aqueous film-

12   forming foam to extinguishing petroleum-based fires such as for jet fuel fire.[20] This

13   foam was also utilized in George's FTA zones for firefighting training purposes

14

15

16   ───────────────────────

17   [16] The USAF started utilizing AFFF in their Fire Training Areas in the 1970s. *See* Amec Foster
     Wheeler Environment and Infrastructure, Inc., *Final Perfluorinated Compounds Determination at*
18   *Multiple BRAC Bases Site Investigation Report George Air Force Base San Bernardino County, CA*
     *Project No. HUUA20147242*, George AR #593983, pg. 10, https://ar.afcec-
19   cloud.af.mil/ViewPdf?id=593983&token=ef%2BINgO7%2FT%2BsJqUvsIn7oKHrpB5E5b9wtvhA
     SeRmPNs%3D (Nov. 2016). *Hereinafter* referred to as Amec 2016.
20
     [17] *Id.*; *See also Superfund Site: George Air Force Base, Victorville, CA – Clean Up Activities*,
21   EPA(Mar. 29, 2024, 2:56 PM),
     https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0902737
22   #bkground.

23   [18] *See* Amec (2016), at 30.; *See also* Adelanto Water Justice Coalition, Adelanto Community Water
     Report 2022, at 9 (2022), https://www.pitzer.edu/cec/wp-
24   content/uploads/sites/54/2023/02/Adelanto_Community_Water_Report_2022-1.pdf.

25   [19] *See* (Amec 2016), at xiv.

26   [20] *Three Arizona Military Bases Now Being Tested for Water Contamination*, Cronkite News (Oct.
     19, 2017) (accessed Apr. 2, 2024), available at https://troubledwater.news21.com/military-bases-
27   contamination-will-affect-water-for-generations/

28   https://cronkitenews.azpbs.org/2017/10/19/three-arizona-military-bases-now-being-tested-for-
     water-contamination/.

                        **Complaint and Jury Demand**

1    and was likely disposed of in the Base's medical waste landfill, as PFOS were

2    detected in samples below the landfill.[21]

3        121.   Plaintiffs lived and/or worked on George Air Force Base and ingested

4    PFAS-contaminated water at or near the military installation, as wells transported

5    the PFAS-laden portable water to all sources of drinking water supplies on and off

6    the Bases.

7        122.   George Air Force Base sourced its drinking water, since the 1950s,

8    from multiple production wells built by the Air Force on land leased from the city

9    of Adelanto.[22] These eight (8) production wells supplied the drinking water for

10   both George and Adelanto.  They are located approximately 0.5 to one (1) mile

11   from the Base's eastern boundary next to the Mojave River.[23]  Drinking water wells

12   were installed at George in the 1980s; however, they were never used to supply

13   drinking water.[24]

14       123.   In 2016, the Air Force tested municipal and private groundwater

15   wells on George Air Force Base and found that all tested wells had levels of

16   PFAS—and at least one well (located on 18399 Shay Road) exceeded 5,000 parts

17   per trillion of PFAS.[25]  Other municipal and domestic wells for supplying

18   drinking water are located along Shay Road and are in close proximity to the

19   George Air Force Base drinking water supply wells.[26]

20

21   _____

22   [21] *See* Amec 2016, at 79.

23   [22] *Id*. at 22.

24   [23] *Id*.; *See* also U.S. Dept. of Health and Human Services, *Public Health Assessment for George Air Force Base Victorville, San Bernardino County, California,* Cerclis No. CA2570024453, at 12 (Dec 1, 1998). *Hereinafter* U.S. Dept. of Health and Human Services (1998).

25   [24] *See* U.S. Dept. of Health and Human Services (1998) at 12.

26   [25] *See* Ella Meyer, et al., *Adelanto Community Water Report*, at 9 (2022),

27   https://www.pitzer.edu/cec/wp-content/uploads/sites/54/2023/02/Adelanto_Community_Water_Report_2022-1.pdf.

28   [26] *Id*.

**Complaint and Jury Demand**

124.   In September 2018, the Lahontan Regional Water Board tested well water of several Victorville residents living only a few hundred feet from the eastern boundary of George Air Force Base and discovered the well water contained high levels of twenty-five (25) separate PFAS chemicals, totaling nine-hundred-forty (940) parts per trillion, well over ten times the EPA's maximum safe-level ppt limit from 2016.[27]

125.   In 2022, the Department of Defense released a report where they tested off-base drinking water and groundwater (not for drinking) for PFOS and PFOA in the surrounding area. The testing revealed levels of PFOS and PFOA in the drinking water reaching as high as 118 parts per trillion (PFOS chemicals) and 20 parts per trillion (PFOA).[28]  Moreover, the ground water showed PFOS levels reaching 1,690 parts per trillion, and PFOA levels as high as 5,210 parts per trillion.[29] These levels dwarf the top threshold for safe drinking water established by the EPA, which advised in 2016 that drinking water levels of PFOS and PFOA combined should not equate to more than 70 parts per trillion, and in March 2023, proposed revision to that legal threshold to be no more than 4 parts per trillion.[30]

126.   Built in 1941, Lackland Air Force Base is located in Bexar County, Texas. Lackland AFB is part of Joint Base San Antonio, an amalgamation of Fort Sam Houston, Randolph Air Force Base and Lackland Air Force Base, which were merged

[27] Civilian Exposure, *PFAS Contamination Near George Air Force Base Threatens Public Health*, Chemical Information, PFAS-PFOS-PFOA, Civilian Exposure (accessed Apr. 1, 2024, 12:25 PM), available at https://www.civilianexposure.org/pfas-contamination-near-george-air-force-base-threatens-public-health/.

[28] U.S. Dep't of Def., *PFAS Snapshot George AFB* (Apr. 23, 2022) (accessed on Apr. 5, 2024), available at https://www.acq.osd.mil/eie/eer/ecc/pfas/docs/data/fs/california/PFAS-Snapshot_George_AFB_042322_508C.pdf.

[29] *Id.*

[30] *Id.; see also Per and Polyfluoroalkyl Substances (PFAS) Proposed PFAS National Primary Drinking Water Regulation*, U.S. Environmental Protection Agency (accessed on Apr. 8, 2024 at 4:30 PM), available at https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas.

**Complaint and Jury Demand**

1    on October 1, 2010. PFAS-containing AFFF foam was used on base, persisted in the

2    environment, and contaminated the groundwater. Independent water testing has found

3    PFAS levels at the Base above EPAs Health Advisory level.

4        127.    Established in 1917 as Chanute Field, Chanute Air Force Base (AFB) was

5    an Air Force training facility located in the east-central Illinois Village of Rantoul.  The

6    Base began as a pilot training school during world War I, and after a brief closure,

7    reopened as a technical training center. Fire protection training was relocated to

8    Chanute in 1964 and continued until the base's closure in 1993.

9        128.    Testing for PFOS and PFOA was performed on Chanute Air Force Base

10    in 2014. The groundwater testing done on Chanute yielded detections of PFOS as high

11    as 1,960,000 ppt and PFOA as high as 151,000 ppt.[31]

12        129.    Plaintiffs were also stationed at various other Air Force Bases and military

13    installations as referenced individually above. The United States Air Force started

14    using AFFF foam in the early 1970's. Therefore, upon information and belief,

15    Plaintiffs and other military and civilians, and their families living and working on

16    Kincheloe Air Force Base, Wright-Patterson Air Force Base, Elmendorf Air Force

17    Base, Joint Base McGuire-Dix-Lakehurst, Keesler Air Force Base, McClellan Air

18    Force Base, Sheppard Air Force Base, Air Force Academy Base, Spangdahlem Air

19    Base, and Lowry Air Force Base ingested PFAS contaminated water at or near the

20    military installations, as wells transported the PFAS-laden portable water to all sources

21    of drinking water supplies on and off the Bases.

22

23

24

25

26

---

27    [31] *See* Final Site Inspection Report for Aqueous Film Forming Foam (AFFF) Areas at Former Chanute
Air Force Base, Illinois (December 2018), accessed at https://ar.afcec-
cloud.af.mil/ViewPdf?id=603728&token=FR0%2F2Zb39ebE7Z%2FG4HleG02S23OqFtQw7zKz3
JoB5oc%3D

28

**Complaint and Jury Demand**

130.   Contamination from PFOA and/or PFOS presents a threat to public health and the environment.[32]

131.   Releases of PFAS to land, air, and water from industrial sites are known pathways to the environment for PFOA and PFOS.

132.   Due to their widespread use in consumer and commercial products, PFAS may also enter the environment from wastewater treatment facilities after the products containing them have been disposed of in landfills, during the use of the products, or in other manners.

133.   Upon information and belief, the United States Air Force has stored and used Defendants' AFFF containing PFOA and/or PFOS chemicals in fire training and response exercises at its military installations and facilities.[33]

134.   As a result of their chemical exposures, Plaintiffs have been directly harmed by PFAS contamination and have thereby suffered damages in an amount to be established at trial.

## DEFENDANTS' KNOWLEDGE OF THE THREAT OF PFAS AND ITS MANUFACTURING AND DISTRIBUTION OF PFAS AND PFAS-CONTAINING AFFF

135.   The following Defendants, at all times relevant to this lawsuit, manufactured, designed, marketed, distributed, released, instructed, promoted, and/or otherwise sold (directly or indirectly) PFAS-containing AFFF products to various locations and entities for fire-extinguishing use, such that each Defendant knew or

---

[32] According to EPA, Exposure to PFOA and PFOS Over Certain Levels May Have Effects On Fetal Development, The Immune System, and the Thyroid Gland, as Well as Cause Liver Damage And Cancer. *See* GAO, *Man-Made Chemicals and Potential Health Risks: EPA Has Completed Some Regulatory-Related Actions for PFAS*, GAO-21-37 (Washington, D.C.: Jan. 27, 2021).

[33] George Air Force Base Restoration Advisory Board, *Chemical Weapons at the Victorville Army Airfield – George AFB*, *Hazardous Toxic & Radioactive Waste (HTRW)*, (accessed Apr. 1, 2024, 12:32 PM), available at https://www.georgeafb.info/chemical-weapons-at-the-victorville-army-airfield-george-afb/

**Complaint and Jury Demand**

1   shown have known said products would be delivered to areas for active use on military

2   installations such as George Air Force Base where Plaintiffs resided and/or worked.

3       136.    Defendants have been manufacturing and/or using PFAS chemicals since

4   the 1940s and continued to do so undeterred even after becoming aware of the harmful

5   effects of these chemicals to humans and the environment.

6       137.    For most of the past seven decades through the early 2000s, 3M was the

7   primary manufacturer of PFAS in the United States.

8       138.    3M went on to market and promoted PFAS, and shipped PFAS to

9   manufacturers, including Old DuPont, throughout the United States, including

10  California. 3M made enormous profits from PFAS and products containing PFAS and

11  shipped PFAS and products containing PFAS to the United States Air Force, including

12  to George Air Force Base and throughout the country for decades until announcing in

13  2000 that it would cease production of PFOA and PFOS.

14

15          **3M'S KNOWLEDGE AND FRAUDULENT COVER-UP OF THE**

16                          **DANGERS OF PFAS**

17      139.    In the 1950s, based on its own internal studies, 3M concluded that PFAS

18  are "toxic."

19      140.    3M knew as early as the mid-1950s that PFAS bioaccumulate in humans

20  and animals.[34]

21      141.    By the early 1960s, 3M understood that some PFAS are highly persistent

22  in the environment, meaning that they do not degrade.

23      142.    3M knew as early as 1960 that chemical waste from its PFAS

24  manufacturing facilities that was dumped into landfills or spilled on natural surfaces

25  would leach into groundwater and otherwise enter the environment. A 3M internal

26

27  _____

    [34] *See* Exhibit 1009, Plaintiff's Second Amended Exhibit List, *State of Minnesota v. 3M Co.*, Case.

28  No. 27-cv-10-28862, Index #1057 (Minn. D. Ct. Feb. 14, 2018), available at
    https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1009.pdf

**Complaint and Jury Demand**

1    memo from 1960 described the company's understanding that such wastes "[would]

2    eventually reach the water table and pollute domestic wells."[35]

3        143.    As early as 1963, 3M was aware that its PFAS products were persistent in

4    the environment and would not degrade after disposal.

5        144.    3M began monitoring the blood of its employees for PFAS, as early as

6    1976, because 3M was concerned about the health effects of PFAS. The studies

7    revealed that some 3M personnel were exposed to fluorochemicals between 100 and

8    300 times the normal levels in their blood.

9        145.    3M documents from 1977 relating to these worker tests further confirm

10   that PFAS bioaccumulate.

11       146.    By at least 1970, 3M knew that its PFAS products were hazardous to

12   marine life.

13       147.    One study of 3M's PFAS around this time had to be abandoned to avoid

14   severe local pollution of nearby surface waters.

15       148.    In 1975, 3M found there was a "universal presence" of at least one form

16   of PFAS in blood serum samples taken from across the United States.[36]

17       149.    Because PFAS are not naturally occurring in any amount, anywhere on

18   the planet, this finding unquestionably alerted 3M to the near inevitability that its

19   products were a pathway for widespread public exposure to its toxic ingredient—a

20   likelihood that 3M considered internally but did not share outside the company.

21       150.    This finding also alerted 3M to the likelihood that this PFAS is mobile,

22   persistent, bio-accumulative, and biomagnifying, as those characteristics would

23   explain the ubiquitous presence of this PFAS from 3M's products in human blood.

24

25

---

26   [35] See Exhibit 1025 at 2, Plaintiff's Second Amended Exhibit List, State of Minnesota v. 3M Co.,
     Case. No. 27-cv-10-28862, Index #1057 (Minn. D. Ct. Feb. 14, 2018), available at
27   https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1025.pdf

28   [36] Technical Report Summary: re Absorption of FC 95 and FC 143 on Soil, Feb. 27, 1978, available
     at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

**Complaint and Jury Demand**

151.   According to a deposition transcript in a lawsuit brought by the State of Minnesota against 3M [No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)] ("Minn. Lawsuit") for damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS as early as 1976, because the company was "concerned" about "health" effects of PFAS. 3M documents from 1977 relating to these worker tests further confirmed that PFAS bioaccumulate.

152.   Other studies by 3M in 1978 showed that PFOA and PFOS are toxic to monkeys. Also in 1978, a group of scientists and doctors met to review the results of various studies as part of the Fluorochemicals in Blood program. At the meeting, Dr. Harold C. Hodge told 3M's then medical director, Dr. F.A. Ubel, that employees' physical examination results should be analyzed in the context of the general population. Specifically, Dr. Hodge stated that "[t]here appears to be indications of liver change from the physical examination results."[37]

153.   In the late 1970s, 3M studied the fate and transport characteristics of PFOS in the environment, including in surface water and biota.

154.   A 1979 report drew a direct line between effluent from 3M's Decatur, Alabama plant and PFAS bioaccumulating in fish tissue taken from the Tennessee River. 3M resisted calls from its own ecotoxicologists going back to 1979 to perform an ecological risk assessment on PFOS and similar chemicals.

155.   3M's own ecotoxicologists continued raising concerns to 3M until at least 1999.

---

[37] 3M Interoffice Correspondence re: Meeting Minutes – Meeting with H.C. Hodge, June 7, 1979, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2724.pdf.

**Complaint and Jury Demand**

156.   In 1983, 3M scientists opined that those concerns about PFAS give rise to legitimate questions about the persistence, accumulation potential, and ecotoxic of [PFAS] in the environment.[38]

157.   In 1984, 3M's internal analyses demonstrated that PFAS were likely bioaccumulating in 3M fluorochemical employees.[39]

158.   According to the Minnesota Attorney General, despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFAS and to suppress research into the potential harms associated with PFAS.

159.   According to a deposition transcript from the Minn. Lawsuit, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products which would result in the loss of hundreds of millions of dollars in annual revenue.[40]

160.   The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

161.   A key priority of an internal 3M committee—referred to as the FC CoreTeam— was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

---

[38] Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988, meeting with DuPont, January 5, 1988, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

[39] Memorandum from D.E. Roach to P.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

[40] *See* Exhibits 2144 & 2204, Plaintiff's Second Amended Exhibit List, *State of Minnesota v. 3M Co.*, Case. No. 27-cv-10-28862, Index #1057 (Minn. D. Ct. Feb. 14, 2018), available at https://www.ag.state.mn.us/Office/Cases/3M/StatesExhibits.asp.

**Complaint and Jury Demand**

162.   In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.

163.   A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy. 3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition transcript in the Minn. Lawsuit, he privately characterized himself as part of the 3M "team."

164.   According to Professor Giesy's deposition transcript in the Minn. Lawsuit, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering a "quid pro quo" with the scientists.[41]

165.   According to emails produced by Professor Giesy in the Minn. Lawsuit, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."[42]

166.   3M's own employees recognized that 3M was concealing known dangers relating to PFAS. For example, in a 1999 resignation letter, an employee stated, "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me, it is unethical to be concerned with markets, legal defensibility, and image over environmental safety."[43]

---

[41] *See Id.* at Exhibit 1740, accessed online at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1740.pdf.

[42] *Id.*

[43] *See id.* at Exhibit 1001, Available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.

**Complaint and Jury Demand**

167.   In response to pressure from the United States Environmental Protection Agency ("EPA"), 3M began to phase out production of PFOS and PFOA products in 2000.

168.   On May 16, 2000, 3M issued a news release asserting that "our products are safe," citing the company's "principles of responsible environmental management" as the reason to cease production.[44]

169.   On the same day as 3M's phase-out announcement, an EPA press release stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term."[45]

170.   In a memo explaining its decision, the EPA noted that PFOS was among certain chemicals that appear to be persistent, bio-accumulative and toxic.[46]

171.   3M knew or should have known that through their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment at the locations Plaintiffs were exposed.

---

[44] *See id.* at Exhibit 1690, available at https://www.ag.state.mn.us/Office/Cases/3M/StatesExhibits.asp

[45] EPA, EPA and 3M Announce Phase Out of PFOS, (May 16, 2000), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/33aa946e6cb11f35852568e1005246b4.html.

[46] *Id.* Also, the California State Water Resources Control Board has concluded that, major sources of PFAS" include industrial sites, landfills, and wastewater treatment plants. It elaborates: "PFAS can get into drinking water when products containing them are used or spilled onto the ground or into lakes and rivers. Once in groundwater, PFAS are easily transported large distances and can contaminate drinking wells." *See* California Water Board, Per- and Polyfluoroalkyl Substances (PFAS) Background,   https://www.waterboards.ca.gov/pfas/background.html.

**Complaint and Jury Demand**

## OLD DUPONT'S KNOWLEDGE AND FRAUDULENT COVER-UP OF THE DANGERS OF PFAS AND MOUNTING LIABILITIES

172. Beginning in the 1950s, Old DuPont manufactured, produced, or utilized PFOA and other PFAS at several facilities in the United States.

173. Throughout this time, Old DuPont was aware that PFOA was toxic, harmful to animals and humans, bio-accumulative, and bio-persistent in the environment. Old DuPont also knew that it directly emitted and discharged, and continued to emit and discharge, PFOA in large quantities into the environment from its manufacturing plants, such that hundreds of thousands of people had been exposed to its PFOA, including through public and private drinking water supplies.

174. Old DuPont company scientists issued internal warnings about the toxins associated with their PFAS products as early as 1961.

175. Old DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

176. In 1978, based on information it received from 3M about elevated and persistent organic fluorine levels in workers exposed to PFAS, Old DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects could be attributed to PFAS exposure.

177. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of organic fluorine.

178. By 1979, Old DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

179. Old DuPont did not report this data or the results of its worker health analysis to any government agency or community.

**Complaint and Jury Demand**

180.    The following year, Old DuPont internally confirmed that PFOA "is toxic," that humans bioaccumulate PFOA in their tissue, and that "continued exposure is not tolerable."

181.    Not only did Old DuPont know that PFOA bioaccumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

182.    In fact, Old DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta if present in maternal blood, but Old DuPont concealed the results of internal studies of its own plant workers confirming placental transfer of PFOA in humans.

183.    While Old DuPont knew about this toxic danger as early as the 1960s, Old DuPont also was aware that PFAS could contaminate the surrounding environment and cause human exposure.

184.    In 1981, Old Dupont tested for and found PFOA in the blood of female plant workers Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defects.[47]

185.    In 1981, Old DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources.

186.    By 1984, Old DuPont unquestionably was aware that PFOA is biopersistent. Old DuPont was long aware that the PFOA it was releasing from its facilities was leaching into groundwater used for public drinking water.

---

[47] DuPont, C-8 Blood Sampling Results, 1981. (xnpw0228). DuPont. C-8 blood sampling results; 1981. (xnpw0228).    https://www.industrydocuments.ucsf.edu/docs/#id=xnpw0228.

**Complaint and Jury Demand**

187.    After obtaining data on these releases and the resulting contamination near Old DuPont's Washington Works plant in West Virginia in 1984, Old DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

188.    Old DuPont employees who attended the 1984 Meeting discussed available technologies that could control and reduce PFOA releases from its manufacturing facilities, as well as potential replacement materials.

189.    Old DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

190.    During the 1984 Meeting, Old DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."[48]

191.    They were resigned to Old DuPont's "incremental liability from this point on if we do nothing" because Old DuPont was "already liable for the past 32 years of operation."[49]

192.    They also stated that the "legal and medical [departments within Old DuPont] will likely take the position of total elimination" of PFOA use in Old DuPont's business, and that these departments had "no incentive to take any other position."[50]

193.    By 2000, Old DuPont's in-house counsel was particularly concerned about the threat of punitive damages resulting from Old DuPont's releases of PFOA at its Washington Works facility in West Virginia.

194.    Old DuPont's own Epidemiology Review Board repeatedly raised concerns about Old DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

---

[48] Schmid, J.A., Personal & Confidential Memorandum, re: C-8 Meeting Summary (May 23, 1984), Wilmington, Del., available at        https://static.ewg.org/files/dupont_elim_PFOA_1984.pdf (last accessed August 3, 2023) (hereinafter "The DuPont Memo").

[49] *See id.*

[50] *See id.*

**Complaint and Jury Demand**

195.   For example, in February 2006, the Epidemiology Review Board "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Old DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."[51]

196.   In 2004, EPA filed an action against Old DuPont based on its failure to disclose toxic and exposure information for PFOA, in violation of federal environmental laws.

197.   In 2005, Old DuPont eventually settled the action by agreeing to pay $10.25 million in a civil administrative penalty and to complete $6.25 million in supplemental environmental projects.

198.   The combined settlement resolved eight counts brought by the EPA alleging violations of the Toxic Substances Control Act and the Resource Conservation and Recovery Act concerning the toxicity of PFAS compounds.

199.   Old DuPont also promised to phase out the production and use of PFOA by 2015.

200.   EPA called the settlement the "largest civil administrative penalty EPA has ever obtained under any federal environmental statute."[52]

201.   Old DuPont and Chemours knew or should have known that in their intended and/or common use products containing PFAS would very likely injure and/or threaten public health and the environment in California.

---

[51] Tom L. Beauchamp, et al., Memorandum to Michael Kaplan re: Epidemiology Review Board and PFOA (February 24, 2006), Available at https://static.ewg.org/files/ERB_February2006.pdf (last accessed August 3, 2023).

[52] Dave Ryan, *EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History*, EPA Newsroom (Dec. 14, 2005), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/fdcb2f665cac66bb852570d7005d6665.html

**Complaint and Jury Demand**

202.   Also, in 2005, a final court order was entered approving Old DuPont's 2004 settlement in the class action lawsuit styled *Leach, et al. v. E. I. du Pont de Nemours & Co.*, Civil Action No. 01-C-608 (Wood Cty. W. Va. Cir. Ct.) (the "Leach Action") filed on behalf of approximately 70,000 individuals with PFOA-contaminated drinking water supplies in Ohio and West Virginia for benefits valued at over $300 million.

203.   Under the terms of the final class action settlement, Old DuPont agreed to fund a panel of independent scientists (the "C8 Science Panel") to conduct whatever studies were necessary to confirm which diseases were linked to class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical monitoring of class members with respect to any diseases linked by the C8 Science Panel to their PFOA exposure. "C-8," a term used internally by DuPont employees, is an alternative name for PFOA.

204.   After seven years of study and analyses, the C8 Science Panel confirmed that PFOA exposures among class members were linked to six serious human diseases, including two types of cancer.

205.   On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[53]

206.   In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, and limits on the manufacture and handling of any

---

[53] *See* Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems, 77 Fed. Reg: 26072 (May 2, 2012).

**Complaint and Jury Demand**

1   PFOA containing product, and to develop safe nonfluorinated alternatives to these
2   products to avoid long-term harm to human health and the environment.[54]

3   207.   On May 25, 2016, the EPA released a lifetime health advisory ("HA") and
4   health effects support documents for PFOS and PFOA.[55] The EPA developed the HA's
5   to assist governmental officials in protecting public health when PFOS and PFOA are
6   present in drinking water. The EPA HA's identified the concentration of PFOS and
7   PFOA in drinking water at or below which adverse health effects are not anticipated to
8   occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HA's were based on peer-
9   reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and
10  mice) and were also informed by epidemiological studies of human populations
11  exposed to PFOS.

12  208.   In 2016, the National Toxicology Program of the United States
13  Department of Health and Human Services ("NTP") and the International Agency for
14  Research on Cancer ("IARC") both released extensive analyses of the expanding body
15  of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA
16  and PFOS are "presumed to be an immune hazard to humans" based on a "consistent
17  pattern of findings" of adverse immune effects in human (epidemiology) studies and

---

[54] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly and perfluoroalkyl substances (PFASs). *Environ Health Perspective* 123: A107–A111, Available at    http://dx.doi.org/10.1289/ehp.1509934.

[55] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate. According to EPA, "...studies indicate that exposure to PFOA and PFOS over certain levels may result in... developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage), immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes)."; *see also* EPA, Fact Sheet PFOA & PFOS Drinking Water Health Advisories, EPA Document Number 800-F-16-003, available at    https://www.epa.gov/sites/default/files/2016-06/documents/drinkingwaterhealthadvisories_pfoa_pfos_updated_5.31.16.pdf (last visited, May 8, 2023).

- 44 -
**Complaint and Jury Demand**

1  "high confidence" that PFOA and PFOS exposure was associated with suppression of

2  immune responses in animal (toxicology) studies.[56]

3      209.   Old DuPont required that Chemours both directly assume its historical

4  PFAS liabilities and indemnify Old DuPont from those liabilities. Chemours explained

5  in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of

6  cases in the [C8] MDL could have a material adverse effect on Chemours' consolidated

7  financial position, results of operations or liquidity."[57]

8      210.   On February 13, 2017, Old DuPont and Chemours agreed to pay $670.7

9  million to resolve the approximately 3,500 then-pending cases in the C8.

10

11  **OLD DUPONT'S MULTI-STEP, FRAUDULENT SCHEME TO ISOLATE**

12  **ITS VALUABLE TANGIBLE ASSETS FROM PFAS LIABILITIES**

13  **AND HINDER CREDITORS**

14      211.   By 2013, Old DuPont knew that it faced substantial environmental and

15  other liabilities arising from its use of PFOA at Washington Works alone, as well as

16  liability related to PFAS contamination at other sites and areas throughout the country,

17  and its sale of products containing PFAS, and that its liability was likely billions of

18  dollars.

19      212.   These liabilities include clean-up costs, remediation obligations, tort

20  damages, natural resource damages and, most importantly, likely massive and

21

22  _____

23  [56] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate

24  (Sept. 2016), at 1, 17, 19, available at

25  https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf Filed: New York County Clerk 03/13/2023 04:41 PM INDEX NO. 152370/2023 NYSCEF DOC. NO. 2 NYSC (last visited,

26  Oct. 25, 2023).

27  [57] *See* The Chemours Company, Form 10-K 2016 at 16, available at

28  https://d1lge852tjjqow.cloudfront.net/CIK-0001627223/fef1bcb1-b84c-46e4-9c3a-54bef7943338.pdf

- 45 -

**Complaint and Jury Demand**

potentially crippling punitive damages arising from Old DuPont's intentional misconduct.

213.   Considering this significant exposure, upon information and belief, by 2013 Old DuPont's management began to consider restructuring the company to, among other things, avoid responsibility for the widespread environmental harm and personal injuries that Old DuPont's PFAS and associated conduct caused, and to shield billions of dollars in assets from these substantial liabilities. Old DuPont referred to this initiative internally as "Project Beta."

214.   Upon information and belief, Old DuPont contemplated various restructuring opportunities, including potential merger structures. In or about 2013, Old DuPont and The Chemical Company ("Old Dow") began discussions about a possible "merger of equals."

215.   Upon information and belief, Old DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS liabilities that Old DuPont faced.

216.   Accordingly, Old DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Old DuPont's massive legacy liabilities from its valuable tangible assets to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

217.   Old DuPont engaged in a three-part restructuring plan, further explained below.

218.   The first step in Old DuPont's plan was to transfer its Performance Chemicals business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) into its wholly owned subsidiary, Chemours. And then, in July 2015, Old DuPont "spun off" Chemours as a separate

**Complaint and Jury Demand**

publicly traded entity and saddled Chemours with Old DuPont's massive legacy liabilities (the "Chemours Spinoff").

219. Old DuPont knew that Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Chemours to assume. Old DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Old DuPont still faced direct liability for its own conduct.

220. Accordingly, Old DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades of illicit conduct regarding PFAS.

221. The second step involved Old DuPont and Old Dow entering an "Agreement and Plan of Merger" in December 2015, pursuant to which Old DuPont and Old Dow with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

222. Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

223. The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Old DuPont's assets to DowDuPont.

224. The third step involved DowDuPont spinning off two, new, publicly traded companies: (i) Corteva, which currently holds Old DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow as a subsidiary. DowDuPont was then renamed New DuPont.

225. As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Old DuPont's tangible assets decreased by $20.85 billion.

226. New DuPont and New Dow now hold the vast majority of the tangible assets that Old DuPont formerly owned.

**Complaint and Jury Demand**

1
2
## **THE CHEMOURS SPINOFF**

3  227. In February 2014, Old DuPont formed Chemours as a wholly-owned
4 subsidiary. Chemours was originally incorporated on February 18, 2014, under the
5 name "Performance Operations, LLC."

6  228. On or about April 15, 2014, the company was renamed "The Chemours
7 Company, LLC," and on April 30, 2015, it was converted from a limited liability
8 company to a corporation named "The Chemours Company."

9  229. Prior to July 1, 2015, Chemours was a wholly-owned subsidiary of Old
10 DuPont. On July 1, 2015, Old DuPont completed the spinoff of its Performance
11 Chemicals Business, consisting of Old DuPont's Titanium Technologies, Chemical
12 Solutions, and fluorochemical products segments, and Chemours became a separate,
13 publicly traded entity.

14  230. The Performance Chemicals Business included fluorochemical products
15 and the business segment that had manufactured, used, and discharged PFOA into the
16 environment.

17  231. Prior to the Chemours Spinoff, Chemours was a wholly owned subsidiary
18 of Old DuPont, and its Board of Directors had three members, all of whom were Old
19 DuPont employees.

20  232. On June 19, 2015, a fourth member of the Board was appointed, and upon
21 information and belief, this fourth member had served as a member of Old DuPont's
22 Board of Directors from 1998 to 2015.

23  233. On July 1, 2015, effective immediately prior to the Chemours Spinoff, the
24 size of the Chemours Board of Directors was expanded to eight members. The three
25 initial Old DuPont employees resigned from the Board, and to fill the vacancies created
26 thereby, seven new members were appointed.

27
28

**Complaint and Jury Demand**

234.   To effectuate the Chemours Spinoff, Old DuPont and Chemours entered into the June 26, 2015, Separation Agreement (the "Chemours Separation Agreement").

235.   Pursuant to the Chemours Separation Agreement, Old DuPont agreed to transfer to Chemours all businesses and assets related to the Performance Chemicals Business, including ~37 active chemical plants.

236.   Old DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all the assets that Old DuPont deemed to be part of the Performance Chemicals Business would be transferred to Chemours.

237.   At the same time, Chemours accepted a broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS, although the specific details regarding the nature, probable maximum loss value, and anticipated timing of the liabilities that Chemours assumed are not publicly available.

238.   Notwithstanding the billions of dollars in PFAS liabilities that Chemours would face, on July 1, 2015, Chemours transferred to Old DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

239.   Thus, in total, Chemours distributed $3.9 billion to Old DuPont. Chemours funded these distributions by entering approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Chemours distributed approximately $3.0 billion in common stock to Old DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

240.   Accordingly, most of the valuable assets that Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, and Old DuPont stripped Chemours's value for itself and its shareholders. In total, Chemours transferred almost $7 billion in stock, cash, and notes to Old DuPont

**Complaint and Jury Demand**

and its shareholders. Old DuPont, however, only transferred $4.1 billion in net assets to Chemours. Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

241.   In addition to the assumption of such liabilities, the Chemours Separation Agreement required Chemours to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

242.   The Chemours Separation Agreement requires Chemours to indemnify Old DuPont against, and assume for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Old DuPont's historic liabilities relating to and arising from its decades of emitting PFOA into the environment.

243.   The Chemours Separation Agreement also requires Chemours to indemnify Old DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

244.   The Chemours Separation Agreement also required Chemours to indemnify Old DuPont from, and assume all, environmental liabilities that arose prior

**Complaint and Jury Demand**

to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

245.    Chemours also agreed to use its best efforts to be fully substituted for Old DuPont concerning any order, decree, judgment, agreement, or action for Old DuPont's environmental liabilities.

246.    Notably, Chemours sued Old DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Old DuPont's PFAS liabilities were properly estimated and (ii) the Court does not limit Chemours' liability that the Chemours Separation Agreement imposes, then Chemours would have been insolvent at the time of the Chemours Spinoff.

247.    There was no meaningful, arms-length negotiation of the Separation Agreement.

248.    In its Delaware lawsuit, Chemours alleges that Old DuPont refused to allow any procedural protections for Chemours in the negotiations, and Old DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff. Indeed, during the period in which the terms of commercial agreements between Chemours and Old DuPont were negotiated, Chemours did not have an independent board of directors or management independent of Old DuPont.

249.    Although Chemours had a separate board of directors, Old DuPont employees controlled the Chemours board. Indeed, when the Chemours Separation Agreement was signed, Chemours was a wholly owned subsidiary of Old DuPont, and the Chemours board consisted of three Old DuPont employees and one former, long-standing member of the Old DuPont board.

250.    Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

**Complaint and Jury Demand**

251.   It is apparent that Old DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Old DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Old DuPont's assets from any financial exposure associated therewith.

252.   Not surprisingly, given Old DuPont's extraction of nearly $4 billion from Chemours immediately prior to the Chemours Spinoff, Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Old DuPont. Indeed, Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Old DuPont restricted its current and future operations.

253.   At the end of December 2014, Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding a total net worth of $130 million.

254.   Removing Chemours' goodwill and other intangibles of $176 million yields a tangible net worth of negative $46 million (that is, Chemours' liabilities were greater than its tangible assets). According to unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Chemours Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.

255.   Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Chemours also had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

**Complaint and Jury Demand**

256.   Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Old DuPont with respect to PFAS, and which Old DuPont and Chemours knew or should have known would be tens of billions of dollars.

257.   Had Chemours taken the full extent of Old DuPont's legacy liabilities into account, as it should have done, it would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

## STEP 2: THE OLD DOW/OLD DUPONT "MERGER"

258.   After the Chemours Spinoff, Old DuPont took the untenable position that it was not responsible for the widespread PFAS contamination that it had caused over several decades. Old DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Old DuPont had transferred to Chemours rested solely with Chemours, not with Old DuPont.

259.   However, Old DuPont could not contractually discharge all its historical liabilities through the Chemours Spinoff, and Old DuPont remained liable for the liabilities it had caused, and that Chemours had assumed.

260.   Old DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including potentially massive punitive damages. So Old DuPont moved to the next phase of its scheme. On December 11, 2015, less than six months following the Chemours Spinoff, Old DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into

**Complaint and Jury Demand**

1  three publicly traded companies through further spinoffs, each of which would occur

2  18 to 24 months following the closing of the merger.

3      261.   To effectuate the transaction, Old DuPont and Old Dow entered into an

4  Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided

5  for (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later

6  named DowDuPont, and then renamed DuPont de Nemours, Inc., (i.e., New DuPont)

7  and (ii) the creation of two new merger subsidiaries into which Old Dow and Old

8  DuPont each would merge.

9      262.   Upon the closing of the DowDuPont Merger, Old Dow merged into one

10  merger subsidiary, and Old DuPont merged into the other merger subsidiary. Thus,

11  because of the merger, and in accordance with the DowDuPont Merger Agreement, Old

12  Dow and Old DuPont each became wholly owned subsidiaries of DowDuPont.

13      263.   Although Old DuPont and Old Dow referred to the transaction as a

14  "merger of equals," the two companies did not actually merge at all, because doing so

15  would have infected Old Dow with all Old DuPont's historical PFAS liabilities. Rather,

16  Old DuPont and Old Dow became affiliated sister companies that were each owned by

17  the newly formed DowDuPont (i.e., New DuPont).

18

19  **STEP 3: THE SHUFFLING, REORGANIZATION, AND FRAUDULENT**

20  **TRANSFER OF ASSETS AWAY FROM OLD DUPONT AND**

21  **SEPARATION OF CORTEVA AND NEW DOW**

22      264.   Following the Dow-DuPont Merger, DowDuPont (i.e., New DuPont)

23  underwent a significant internal re-organization and engaged in numerous business

24  segment and product line "realignments" and "divestitures." The net effect of these

25  transactions has been the transfer, either directly or indirectly, of a substantial portion

26  of Old DuPont's assets out of the company.

27

28

**Complaint and Jury Demand**

265.   While, again, the details of these transactions remain hidden from Plaintiffs and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Old DuPont, including with respect to its substantial PFAS liabilities. The significant internal reorganization instituted by DowDuPont (i.e., New DuPont) was in preparation for the conglomerate being split into three, separate, publicly traded companies.

266.   Old DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont (i.e., New DuPont), which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the combined assets into three distinct divisions: (i) the "Agriculture Business"; (ii) the "Specialty Products Business"; and (iii) the "Material Sciences Business."

267.   While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Old DuPont transferred a substantial portion of its valuable assets to DowDuPont (i.e., New DuPont), for far less than the assets were worth.

268.   Once the assets of Old DuPont and Old Dow were combined and reorganized, DowDuPont (i.e., New DuPont) incorporated two new companies to hold two of the three newly formed business lines: (i) Corteva, which became the parent holding company of Old DuPont, which in turn holds the Agriculture Business; and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont (i.e., New DuPont) retained the specialty products business, and prepared to spin off Corteva and New Dow into separate, publicly traded companies.

269.   The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Corteva, New Dow, and DowDuPont

**Complaint and Jury Demand**

(i.e., New DuPont) (the "DowDuPont Separation Agreement"). The Dow DuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Corteva (Agriculture Business), New Dow (Materials Science Business) and New DuPont (Specialty Products Business), respectively. New DuPont also retained several "non-core" business segments and product lines that once belonged to Old DuPont.

270. Similarly, Corteva, New Dow, and New DuPont each retained the liabilities primarily related to the business divisions that they retained, i.e., (i) Corteva retained and assumed the liabilities related to the Agriculture Business; (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business; and (iii) New Dow retained and assumed the liabilities related to the Materials Science Business.

271. Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a pro-rata basis between Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to New DuPont and 29% to Corteva.

272. The separation of New Dow was completed on or about April 1, 2019, when DowDuPont (i.e., New DuPont) distributed all New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker, "DOW."

273. On or about May 2, 2019, DowDuPont (i.e., New DuPont) consolidated the Agricultural Business line into Old DuPont, and then, on or about May 31, 2019, it "contributed" Old DuPont to Corteva. The following day, on June 1, 2019, DowDuPont (i.e., New DuPont) spun off Corteva as an independent public company.

**Complaint and Jury Demand**

274.   Corteva now holds 100% of the outstanding common stock of Old DuPont. Corteva now also trades on the NYSE under the stock ticker "CTVA."

275.   The separation of Corteva was completed on or about June 1, 2019, when DowDuPont distributed all Corteva's common stock to DowDuPont (i.e., New DuPont) stockholders as a pro rata dividend.

276.   The corporate structures of New Dow and Old Dow, and Corteva and Old DuPont, respectively, following the separations are depicted below with substantially fewer tangible assets than they had prior to the restructuring.

277.   On or about June 1, 2019, Dow DuPont changed its registered name to Dupont de Nemours (meaning New Dupont).

278.   The net outcome of these transactions was to strip Old Dupont of its substantial tangible assets and transfer them to the new Dupont and Corteva for far less than they were originally worth.

279.   Old Dupont expected that the Dow-DuPont merger created 'goodwill' worth billions of dollars. When the Corteva separation was complete, a portion of this 'goodwill' was assigned to Old-DuPont Dow-DuPont to prop up its balance sheet. The Old DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

280.   In addition, Old DuPont owes a debt to Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Old DuPont's finances and the drastic change in its financial condition before and after the above transactions.

281.   For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Old DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Corteva separation, however, Old DuPont reported a net loss of negative $1 billion and

**Complaint and Jury Demand**

1  only $996 million in cash provided by operating activities. That is a decrease of 128%

2  in net income and a decrease of 73% in annual operating cash flow.

3      282.   Additionally, Old DuPont reported a significant decrease in Income from

4  Continuing Operations Before Income Taxes ("EBT"). Old DuPont reported $4.9

5  billion in EBT for the period ending December 31, 2014. For the period ending

6  December 31, 2019, Old DuPont reported EBT of negative $422 million.

7      283.   The value of Old DuPont's tangible assets further underscores Old

8  DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the

9  Chemours Spinoff, Old DuPont owned nearly $41 billion in tangible assets. For the

10  fiscal year ended 2019, Old DuPont owned just under $21 billion in tangible assets.

11      284.   That means in the five-year period over which the restructuring occurred,

12  when Old DuPont knew that it faced billions of dollars in PFAS liabilities, Old DuPont

13  transferred or divested approximately half of its tangible assets—totaling $20 billion.

14      285.   As of September 2019, just after the Corteva spinoff, Old DuPont reported

15  $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of

16  assets, including "goodwill" from its successive restructuring activities.

17      286.   At the same time, Old DuPont reported liabilities totaling $22.060 billion.

18  Thus, when the Corteva spinoff was complete, Old DuPont's tangible net worth

19  (excluding its intangible assets) was negative $644 million.

20      287.   Old DuPont's financial condition has continued to deteriorate. By the end

21  of fiscal year 2019, Old DuPont reported $42.397 billion in total assets, half of which

22  (or $21.653 billion) are intangible assets. Old DuPont's reported liabilities for the same

23  period totaled $21.869 billion.

24      288.  Old DuPont's tangible net worth between September 30, 2019, and

25  December 31, 2019, declined even further, whereby Old DuPont ended fiscal year 2019

26  with a tangible net worth of negative $1.125 billion.

27

28

**Complaint and Jury Demand**

289.   New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Old DuPont, and for which Old DuPont has received less than reasonably equivalent value.

290.   Old DuPont's parent holding company, Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by its wholly owned subsidiary, Old DuPont. However Old DuPont does not have sufficient tangible assets to satisfy this debt obligation.

## **PLAINTIFFS ASSERT AGAINST THE DEFENDANTS AS FOLLOWS:**

291.   Throughout the duration of the Plaintiffs' exposure due to military service and/or residence on Air Force Bases and the surrounding geographic areas, Plaintiffs ingested Defendants' AFFF- and AFFF-related contaminates in their drinking water.

292.   At no point during Plaintiffs training or career did Plaintiffs receive any warning that Defendants' AFFF and/or PFOS chemicals were toxic or carcinogenic.

293.   Plaintiffs suffered their respective injuries as a result of exposure to Defendants' AFFF products.

294.   As a result of this exposure, Plaintiffs has suffered both personal damages and continues to suffer as a proximate result of Defendants' actions and inactions herein alleged.

295.   Plaintiff have suffered personal damages and continues to suffer as a proximate result of Defendants' actions and inactions herein alleged.

296.   Plaintiffs resided at the George Air Force Base and other Air Force Bases listed respectively above, at times material to their PFAS exposure.

**Complaint and Jury Demand**

## COUNT I: STRICT PRODUCT LIABILITY BASED ON DESIGN DEFECT
### (BY PLAINTIFFs AGAINST ALL DEFENDANTS)

297.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

298.    Defendants were engaged in the business of researching, designing, manufacturing, testing, marketing, distributing, and/or selling Fluorochemical Products.

299.    As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of Fluorochemical Products, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

300.    At the time of manufacture, Defendants knew that the chosen formulation(s) of Fluorochemical Products was not biodegradable, would bioaccumulate in humans and wildlife, and was toxic to humans and the environment.

301.    Defendants were also aware and/or in possession of an available safer design that was functional and reasonably priced.

302.    Defendants were also aware that their Fluorochemical Products, when sold would contaminate Plaintiffs' drinking water supply and cause damages.

303.    Defendants' Fluorochemical products were manufactured for placement into trade or commerce.

304.    On information and belief, the Fluorochemical Products as manufactured and/or sold by Defendants reached Plaintiffs' drinking water supply without substantial change in its condition and was used by consumers, local manufacturers, local fire training facilities, local fire departments, and airports, among others, in a reasonably foreseeable and intended manner.

305.    The Fluorochemical Products, as manufactured and/or sold by the Defendants, were "defective" and "unreasonably dangerous" when they left the Defendants' control, entered the stream of commerce, and were received by consumers,

**Complaint and Jury Demand**

manufacturers, firefighting training academies, local fire departments, and airports, among others because it was dangerous to an extent beyond that which would be contemplated by the ordinary user.

306.    The Fluorochemical Products Defendants manufactured and/or sold were defective in design because, even when used as intended and directed by Defendants, they can result in the contamination of soil and groundwater with PFOA and/or PFOS creating a significant threat to drinking water supplies.

307.    The Fluorochemical Products Defendants manufactured did not meet a consumer's reasonable expectation as to their safety because of the propensity to contaminate soil and groundwater when used as intended.

308.    Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were technologically feasible, practical, commercially viable, and marketable at the time Defendants introduced Fluorochemical Products containing PFOA and/or PFOS into the stream of commerce and places where the Plaintiffs consumed drinking water.

309.    The specific risk of harm in the form of soil, groundwater, and drinking water contamination from Fluorochemical Products containing PFOA and/or PFOS that Defendants manufactured and/or sold was reasonably foreseeable or discoverable by Defendants.

310.    The design, formulation, manufacture and/or distribution and sale of Fluorochemical Products containing PFOA and/or PFOS that were known to be toxic and extremely mobile and persistent in the environment was unreasonably dangerous.

311.    Fluorochemical Products' failure to perform safely was a proximate cause of Plaintiffs' damages requiring damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

**Complaint and Jury Demand**

## COUNT II: STRICT PRODUCT LIABILITY BASED ON FAILURE TO WARN (BY PLAINTIFFs AGAINST ALL DEFENDANTS)

312.   Plaintiffs repeat and restates the allegations set forth in the previous paragraphs as if fully set forth herein.

313.   The use of Fluorochemical products in the proximity of the Plaintiffs' drinking water supply for consumer use, manufacturing, training of fire personnel, firefighting, and disposal in landfills was a reasonably foreseeable use. Defendants knew or should have known that Fluorochemical Products used in this manner can contaminate soil, surface water, stormwater, and groundwater with PFOA and/or PFOS, creating a significant threat to human health and the environment.

314.   It was foreseeable that PFOA and/or PFOS from the Fluorochemical Products that Defendants manufactured and sold would enter the environment, resulting in the contamination of drinking water supplies that rely upon surface water as a source, including Plaintiffs' drinking water supply.

315.   Defendants knew or should have known of the risks posed by their Fluorochemical Products.

316.   The ordinary consumer—whether residential, industrial, municipal, or otherwise— would not have known or appreciated the risk of contamination from ordinary use and disposal of Defendants' Fluorochemical Products without an appropriate warning.

317.   Defendants had a duty to warn Plaintiffs, regulators, the public, and the users of Fluorochemical Products of these hazards.

318.   Defendants, however, failed to provide adequate warnings of these hazards.

319.   Defendants' failure to issue the proper warnings relating to Fluorochemical Products containing PFOA and/or PFOS affected the market's acceptance of these products containing PFOA and/or PFOS.

**Complaint and Jury Demand**

320.   Defendants' failure to issue the proper warnings relating to Fluorochemical Products containing PFOA and/or PFOS prevented the users of the product from treating them differently with respect to their use and environmental cleanup.

321.   Defendants' failure to issue the proper warnings related to Fluorochemical Products containing PFOA and/or PFOS prevented the users of the product from seeking alternative products, including but not limited to, using alternative products for purposes of training.

322.   Defendants' action in placing Fluorochemical Products containing PFOA and/or PFOS into the stream of commerce without an appropriate warning as to use, possible toxic contamination, and disposal was a direct and proximate cause of Plaintiffs' injuries.

323.   Defendants knew or should have known, in the exercise of ordinary care, that their PFAS products were unreasonably dangerous and failed to warn of their dangerous propensity.

324.   As a direct and proximate result of the Defendants' failure to warn, Plaintiffs have suffered damage in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

## COUNT III: STRICT LIABILITY (ABNORMALLY DANGEROUS ACTIVITY) (BY PLAINTIFFS AGAINST DEFENDANTS)

325.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

326.   At all relevant times, Defendants designed, manufactured, marketed, distributed, sold disposed of, discharged, and emitted hazardous substances from their facilities which they owned, controlled, and operated.

**Complaint and Jury Demand**

327. The use of Fluorochemical products in the proximity of Plaintiffs' drinking water supply for consumer use, manufacturing, training of fire personnel, firefighting, and disposal in landfills was a reasonably foreseeable use. Defendants knew or should have known that Fluorochemical Products used in this manner can contaminate soil, surface water, stormwater, and groundwater with PFOA and/or PFOS, creating a significant threat to human health and the environment.

328. It was foreseeable that PFOA and/or PFOS from the Fluorochemical Products that Defendants manufactured and sold would enter the environment, resulting in the contamination of drinking water supplies that rely upon surface water as a source, including Plaintiffs' drinking water supply.

329. Defendants knew or should have known of the risks posed by their Fluorochemical Products.

330. The ordinary consumer—whether residential, industrial, municipal, or otherwise—would not have known or appreciated the risk of contamination from ordinary use and disposal of Defendants' Fluorochemical Products without an appropriate warning.

331. Defendants had a duty to warn Plaintiffs, regulators, the public, and the users of Fluorochemical Products of these hazards.

332. Defendants, however, failed to provide adequate warnings of these hazards.

333. Defendants' failure to issue the proper warnings relating to Fluorochemical Products containing PFOA and/or PFOS affected the market's acceptance of these products containing PFOA and/or PFOS.

334. Defendants' failure to issue the proper warnings relating to Fluorochemical Products containing PFOA and/or PFOS prevented the users of the product from treating them differently with respect to their use and environmental cleanup.

**Complaint and Jury Demand**

335.   Defendants' failure to issue the proper warnings related to Fluorochemical Products containing PFOA and/or PFOS prevented the users of the product from seeking alternative products, including but not limited to, using alternative products for purposes of training.

336.   Defendants' action in placing Fluorochemical Products containing PFOA and/or PFOS into the stream of commerce without an appropriate warning as to use, possible toxic contamination, and disposal was a direct and proximate cause of Plaintiffs' injuries.

337.   Defendants knew or should have known, in the exercise of ordinary care, that their PFAS products were unreasonably dangerous and failed to warn of their dangerous propensity.

338.   As a direct and proximate result of the Defendants' failure to warn, Plaintiffs have suffered damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

## COUNT IV: STRICT LIABILITY – STATUTORY (BY PLAINTIFFS AGAINST DEFENDNATS)

339.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

340.   Plaintiffs assert any and all remedies available under statutory causes of action the Plaintiffs' states for strict liability against each Defendant.

341.   The Defendants were engaged in designing, manufacturing, marketing, selling, and distributing AFFF.

342.   AFFF was in a defective condition and unreasonably dangerous to users and/or consumers when designed, manufactured, marketed, sold, and/or distributed to the public by the Defendants.

**Complaint and Jury Demand**

343.   As a direct and proximate result of the Defendants products' aforementioned defects, the Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

344.   The Defendants are strictly liable in tort to the Plaintiff for their wrongful conduct.

## COUNT V: NEGLIGENCE (BY PLAINTIFF AGAINST ALL DEFENDANTS)

345.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

346.   Defendants had a duty to Plaintiffs to manufacture and/or market, distribute, and sell their Fluorochemical Products in a manner that avoided contamination of the environment and drinking water supplies and avoided harm to those who foreseeably would be injured by the PFOA and/or PFOS contained in Defendants' Fluorochemical Products.

347.   The use, including the disposal, of Defendants' Fluorochemical Products by consumers, manufacturers, local fire training academies, fire departments, airports and others was a reasonably foreseeable use. Defendants knew or should have known that their Fluorochemical Products used and disposed of in this manner would contaminate soil, groundwater, and surface water with PFOA and/or PFOS, creating a significant threat to human health and the environment. Defendants had a duty to prevent the release into the environment of PFOA and/or PFOS, in the foreseeable uses of their Fluorochemical Products to avoid harming those would consume drinking water in the immediate vicinity, including the Plaintiffs.

**Complaint and Jury Demand**

348.    Upon learning of the science-based harm and/or potential harm from PFAS exposure, including results of Defendants' internally conducted tests and government findings, Defendants owed Plaintiffs a duty to act reasonably and to give Plaintiffs adequate warnings. Defendants breached their duties when they negligently continued to manufacture, market, distribute, sell, or use PFAS chemicals in such a manner as to result in the contamination of Plaintiffs' soil, surface water and groundwater, and without giving Plaintiffs adequate warning about the dangers of PFAS to humans and the environment.

349.    Defendants further breached that duty by continuing to release contaminants into Plaintiffs' local water supply by continuing their manufacture, marketing, sale, and/or use of PFAS chemicals within the proximity of Plaintiffs' drinking water supply and by failing to remediate its contamination.

350.    As a direct and proximate result of Defendants' breach of their duties, Defendants, individually and collectively, caused Plaintiffs to suffer damages, including damages associated with Plaintiffs' medical conditions, pain and suffering, fear of developing future medical illnesses, and such other damages in an amount to be determined at trial. Defendants are strictly, jointly, and severally liable for all such damages.

**COUNT VI: NEGLIGENCE PER SE**

351.    Plaintiffs hereby incorporate by reference the allegations in the preceding paragraphs of this Complaint as if restated in full herein.

352.    Plaintiffs bring this causes of action pursuant to all relevant common law and state statutory provisions, including but not limited to 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 300i-1 and 6921-6939e to the extent that they impose duties of care on Defendants respecting Defendants' actions and/or omissions towards Plaintiffs and/or the Plaintiffs' safety.

**Complaint and Jury Demand**

353.   As a result of Defendants' acts and/or omissions resulting in harm to Plaintiffs, Defendants violated and/or continue to violate and/or breach one or more federal statutes and/or duties, including but not limited to 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 300i-1 and 6921-6939e, constituting negligence per se, including liability for all injuries to Plaintiffs associated with the fluorochemical products.

354.   Defendants' violation of law and breach of its statutory duties directly and proximately caused and continue to cause damage directly and proximately to Plaintiffs in the form of bodily and emotional injury.

**COUNT VII: BATTERY (BY PLAINTIFF AGAINST ALL DEFENDANTS)**

355.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated fully herein.

356.   At all relevant times, Defendants possessed knowledge that the AFFF containing PFAS which they designed, engineered, manufactured, fabricated, sold, handled, released, trained users on, produced instructional materials for, used, and/or distributed were bio-persistent, bio-accumulative, toxic, potentially carcinogenic, and/or harmful/injurious and that their continued manufacture, use, sale, handling, release, and distribution would result in Plaintiffs having PFAS in their blood, and the biopersistence and bioaccumulation of such PFAS in Plaintiffs' Blood.

357.   However, despite possessing such knowledge, Defendants knowingly, purposefully, and/or intentionally continued to engage in such acts and/or omissions, including but not limited to all such acts and/or omissions described in this Complaint, that continued to result in Plaintiffs accumulating PFAS in their blood and/or bodies, and such PFAS persisting and accumulating in Plaintiffs' blood and/or bodies such that it eventually manifested into an injury.

358.   Defendants did not seek or obtain permission or consent from Plaintiffs to put or allow PFAS materials into each Plaintiff's blood and/or their individual bodies, or to persist in and/or accumulate in each Plaintiffs' blood and/or body.

359.   Entry into, persistence in, and accumulation of such PFAS in Plaintiffs' bodies and/or blood without permission or consent is an unlawful and harmful and/or offensive physical invasion and/or contact with Plaintiffs' person and unreasonably interferes with Plaintiffs' rightful use and possession of each Plaintiff's blood and/or body.

360.   At all relevant times, the PFAS present in the blood of each Plaintiff originated from Defendants' acts and/or omissions.

361.   Defendants continue to knowingly, intentionally, and/or purposefully engage in acts and/or omissions that result in the unlawful and unconsented-to physical invasion and/or contact with each Plaintiff that resulted in persisting and accumulating levels of PFAS in each Plaintiff's blood.

362.   Plaintiffs, and any reasonable person, would find the contact at issue harmful and/or offensive.

363.   Defendants acted intentionally with the knowledge and/or belief that the contact, presence and/or invasion of PFAS with, onto and/or into each of the each Plaintiff's blood, including its persistence and accumulation in the blood, was substantially certain to result from those very acts and/or omissions.

364.   Defendants' intentional acts and/or omissions resulted directly and/or indirectly in harmful contact with Plaintiffs' blood and/or bodies.

365.   The continued presence, persistence, and accumulation of PFAS in the blood and/or body of Plaintiff is offensive, unreasonable, and/or harmful, and thereby constitutes a battery,

**Complaint and Jury Demand**

366.   The continued presence, persistence, and accumulation of PFAS in the blood and/or body of Plaintiffs is offensive, unreasonable, and/or harmful, and thereby constitutes a battery.

367.   As a direct and proximate result of Defendants' negligence, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, economic loss and damages including, but not limited to medical expenses, lost income, and/or other damages.

## COUNT VIII: CONCEALMENT, MISREPRESENTATION, AND FRAUD (BY PLAINTIFFS AGAINST DEFENDANTS)

368.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated fully herein.

369.   The Defendants have a general duty to inform Plaintiffs about the actual and potential harm to Plaintiff from direct and proximate exposure to Defendants' chemical products.

370.   The Defendants negligently, knowingly, willfully and maliciously concealed and falsely misrepresented information concerning the harmful nature of the fluorochemicals from the Plaintiffs with the intent to deceive Plaintiffs. Plaintiffs thereby suffered and continue to suffer harm and damage.

371.   Defendants knew that information concerning the safety risks associated with fluorochemicals and their presence in Defendants' products were material facts to Plaintiffs.

372.   Defendants committed fraud against the Plaintiffs by affirmatively representing that Defendants' fluorochemical products were harmless and did not present any risk of harm, when Defendants knew, reasonably should have known, or had cause to know, that their products had caused, and were continuing to cause, bodily injury and/or risk of such bodily injury to the Plaintiffs.

**Complaint and Jury Demand**

373.    Plaintiffs relied on Defendants' affirmative representations and/or omissions in believing that Defendants' fluorochemical products were safe. Plaintiffs thereby continued to use and/or be exposed to the fluorochemical products, and in not seeking treatment and/or ways to remedy their past exposure to Defendants' fluorochemical products. If Plaintiffs had known or otherwise been properly made aware, the Plaintiffs would have acted reasonably and differently to reduce or prevent his exposure, including finding alternative sources of drinking water.

374.    Defendants are liable to the Plaintiffs.

**PRAYER FOR RELIEF WHEREFORE**, Plaintiffs respectfully request judgment against Defendants as follows:

A.    Entry of judgment in Plaintiffs' favor and against Defendants, jointly and severally, as applicable, on each Count of this Complaint;

B.    Compensatory damages to Plaintiffs for past and future damages, including but not limited to pain and suffering for severe and permanent injuries sustained by Plaintiffs, medical costs, and medical monitoring.

C.    Damages associated with fear of developing future serious diseases or illnesses such as cancers;

D.    Interests and costs as provided by law;

E.    An award to Plaintiffs for the fees and costs of these proceedings (including but not limited to expert fees) and reasonable attorneys' fees, as provided by law;

F.    An award for punitive damages for the wanton, willful, fraudulent, and/or reckless acts of the Defendants in an amount sufficient to punish Defendants and deter future similar conduct; and

G.    An award for such other and further relief as the nature of this case may require or as this Court deems just, equitable and proper.

**Complaint and Jury Demand**

Dated:  April 22, 2024                    **ONE LLP**


                                          By:  /s/ Joanna Ardalan
                                               Joanna Ardalan

                                          *Attorneys for Plaintiffs*




## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury of all issues so triable under the law.


Dated: April 22, 2024                     **ONE LLP**


                                          By:  /s/ Joanna Ardalan
                                               Joanna Ardalan

                                          *Attorneys for Plaintiffs*

**Complaint and Jury Demand**